*Trustees of the NYSNAPP v. White Oak Glob. Adv.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2023

Argued: October 25, 2023     Decided: May 21, 2024

Docket No. 22-1783

_____

THE TRUSTEES OF THE NEW YORK STATE NURSES ASSOCIATION PENSION PLAN,

*Petitioner-Appellee,*

—v.—

WHITE OAK GLOBAL ADVISORS, LLC,

*Respondent-Appellant.*[*]

_____

Before: LYNCH and PARK, *Circuit Judges*, and CLARKE,[†] *District Judge*

_____

Respondent-Appellant White Oak Global Advisors, LLC appeals from a judgment of the United States District Court for the Southern District of New York (Kaplan, J.), entered in favor of Petitioner-Appellee Trustees of the New York State Nurses Association Pension Plan on their petition to confirm an arbitral award between the parties. The award, resolving several ERISA fiduciary duty claims brought by the Trustees against White Oak, was rendered pursuant to an arbitration clause contained in the investment management agreement by which White Oak assumed its ERISA fiduciary relationship to the pension plan.

_____

[*] The Clerk of Court is respectfully directed to amend the caption.

[†] Judge Jessica G. L. Clarke, of the United States District Court for the Southern District of New York, sitting by designation.

On appeal, White Oak argues that the district court lacked jurisdiction to confirm the award after the Supreme Court's decision in *Badgerow*, which held that federal courts cannot premise jurisdiction over a Federal Arbitration Act §§ 9-11 petition based on whether jurisdiction would have existed over the underlying dispute. White Oak further contends that, even if jurisdiction existed, the court erroneously interpreted the award when it granted the Trustees pre-award interest on the disgorgement of the Plan's assets, return of the "Day One" fees collected by White Oak, and White Oak's "profits," as the award did not grant or was ambiguous regarding such relief. Finally, White Oak asserts that the district court abused its discretion in ordering, under its inherent authority, payment of the Trustees' attorneys' fees and costs for the entirety of the confirmation proceeding.

We conclude that the Trustees' petition is cognizable under ERISA § 502(a)(3), as the Trustees are a party authorized by that provision to sue; to enforce a right – the arbitration agreement – created by a plan document or term; and to request equitable relief against a co-fiduciary to the plan. Such suits, brought by a fiduciary on behalf of the beneficiaries to enforce a plan document or term against a co-fiduciary, seek relief traditionally equitable in nature. We therefore agree with the district court that it possessed jurisdiction to confirm the arbitral award. Turning to the merits, we find that the award unambiguously granted disgorgement of prejudgment interest and the "Day One" fees, but that the award of profits is too ambiguous to enforce and must be remanded to the arbitrator for clarification. Finally, we agree that the district court failed to make sufficiently specific findings tailored to White Oak's conduct so as to justify the award of attorneys' fees and costs for the entirety of the confirmation proceeding.

Accordingly, we **AFFIRM** the order confirming the arbitral award insofar as it grants disgorgement of pre-award interest and the "Day One" fees; **VACATE** and **REMAND** insofar as the court confirmed the disgorgement of "profits," with instructions to the district court to remand this item of relief to the arbitrator for a determination of the existence and extent of profits; and **VACATE** and **REMAND** the order granting the Trustees their attorneys' fees and costs on the action to confirm the arbitral award for the district court to make more specific findings justifying its sanction.

_____

C. WILLIAM PHILLIPS, Covington & Burling LLP, New York, NY (Jonathan M. Sperling, Covington & Burling LLP, New York, NY; Robert Newman, Covington & Burling LLP, Washington DC, *on the briefs*), *for Petitioner-Appellee Trustees of the New York State Nurses Association Pension Plan*.

EAMON JOYCE, Sidley Austin LLP, New York, NY (James O. Heyworth, Tyler J. Domino, Sidley Austin LLP, New York, NY; Carter G. Phillips, Sidley Austin LLP, Washington DC; Thomas K. Cauley, Jr., Steven E. Sexton, Rebecca M. Lewis, Sidley Austin LLP, Chicago, IL, *on the briefs*), *for Respondent-Appellant White Oak Global Advisors, LLC.*

_____

GERARD E. LYNCH, *Circuit Judge*:

Respondent-Appellant White Oak Global Advisors, LLC ("White Oak") appeals from a judgment of the United States District Court for the Southern District of New York (Lewis A. Kaplan, J.), entered in favor of Petitioner-Appellee Trustees ("Trustees") of the New York State Nurses Association Pension Plan ("NYSNAPP" or "Plan") on their petition to confirm an arbitral award. The award, which resolved several claims brought by the Trustees against White Oak under the Employee Retirement Income Security Act ("ERISA"), was rendered pursuant to an arbitration clause contained in the investment management agreement by which White Oak assumed its ERISA fiduciary relationship to the Plan.

3

At the time that the Trustees filed their petition, this circuit used the "look through" approach to determine subject matter jurisdiction over petitions under sections 9–11 of the Federal Arbitration Act ("FAA") to confirm, vacate, or modify an arbitration award. Under that approach, if the arbitration resolved federal claims, then the district court could exercise federal question jurisdiction over the petition. But shortly after the district court entered judgment for the Trustees, the Supreme Court determined that the "look through" approach applicable to FAA § 4 petitions to compel arbitration did not extend to FAA §§ 9–11 petitions to confirm, vacate, or modify the resulting awards. *Badgerow v. Walters*, 596 U.S. 1, 5 (2022). Rather, a jurisdictional basis independent of the FAA must appear on "the face of the application itself." *Id*. at 9. Seizing this opportunity, White Oak argues on appeal, as it did before the district court, that the judgment must be vacated for lack of jurisdiction.

White Oak's eleventh-hour jurisdictional attack on the judgment fails. This particular petition raises an independent jurisdictional basis because it is cognizable under ERISA § 502(a)(3), which permits, *inter alia*, plan fiduciaries to sue in federal court for "appropriate equitable relief" to enforce the "terms of the plan" or another fiduciary's duty to act "in accordance with the documents and

4

instruments governing the plan." 29 U.S.C. §§ 1104(a)(1)(D); 1132(a)(3). The arbitration agreement, contained in the contract by which White Oak assumed fiduciary duties to the Plan, is a plan document or term, and a fiduciary-duty suit brought by a fiduciary against a co-fiduciary to enforce the terms of a plan document seeks relief traditionally available in equity. We therefore agree with the district court that it possessed jurisdiction to confirm the award.

White Oak further challenges the district court's judgment on the merits, arguing that the court erroneously interpreted the award and improperly required it to pay the Trustees' fees and costs. As explained below, we find that the award unambiguously granted disgorgement of prejudgment interest and the so-called "Day One" fees, but that the award of profits is too ambiguous to enforce and must be remanded to the arbitrator for clarification. Finally, we agree with White Oak that the district court exceeded its discretion in ordering White Oak to pay the Trustees' attorneys' fees and costs for the entirety of the confirmation proceeding, as the court failed to make sufficiently specific findings, tailored to White Oak's conduct, to support that award.

Accordingly, we AFFIRM the district court's judgment as to the disgorgement of prejudgment interest on assets and the "Day One" fees,

VACATE the judgment as to the disgorgement of White Oak's profits and payment of the Plan's attorneys' fees and costs during the court's proceedings, and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

### I. The Dispute

The NYSNAPP is an ERISA multi-employer retirement benefit fund that serves the members of the New York State Nurses Association. The Plan is governed by its Trustees and employs an internal investment department, headed by a Chief Investment Officer ("CIO"). From at least 2013 to 2016, the Plan's CIO was Russell Niemie. As permitted by ERISA, the Plan contracts with external investment managers to manage its assets.

In 2013, Niemie identified White Oak as a potential investment manager for a portion of the Plan's assets. The Trustees accepted Niemie's recommendation and signed a two-year investment management agreement (the "IMA") with White Oak, effective December 31, 2013. App'x 142. White Oak agreed to act as the Plan's investment manager and to comply with its fiduciary duties to the Plan under ERISA. In return, the IMA gave White Oak "sole and exclusive investment discretion and management" over the Plan's $80,000,000

6

investment with White Oak, which included the authority to commit those assets to White Oak's proprietary investment funds. S.App'x 4–5. However, the IMA provided that, in doing so, White Oak was not permitted to violate the terms of the IMA or waive its statutory duties under ERISA.

As set forth in the IMA, the Plan agreed to compensate White Oak through two sets of fees. First, White Oak would be paid an annualized "management fee," calculated at 1.35% of the Plan's initial investment, to reimburse White Oak for its investment services. Second, White Oak would collect "carried interest fees" based on the performance of its investments on behalf of the Plan – if White Oak achieved greater than a 7.5% return on the Plan's investment in a given year, then it would retain a percentage of the profits in excess of that amount. The IMA further provided that White Oak could not collect any other fees from the Plan without advance written approval from the Trustees.

The parties wisely anticipated that their relationship might not remain amicable, and included contractual provisions to deal with that possibility. The IMA permitted White Oak to unilaterally terminate the agreement, so long as it gave the Plan ninety days prior written notice. However, in the event of such termination, the Plan retained the option to extend the IMA until the earlier of six

months or the Plan's appointment of a successor investment manager. By contrast, the IMA permitted the Plan to terminate the agreement "at any time . . . without penalty." App'x 176. In the event of a termination by either party, the IMA required White Oak to return, within thirty days of the termination date, "all books, records, accounts, cash, securities, . . . and all other property" of the Plan to its control. *Id*. at 175.

Finally, the IMA contained a dispute resolution provision, wherein the Plan and White Oak agreed that, "[a]ny dispute arising under this Agreement shall be resolved by arbitration." *Id*. at 182.

During the period in which the IMA was effective, White Oak invested the Plan's assets into its proprietary "feeder funds"[1] – the Pinnacle Feeder Fund I, L.P. (the "Pinnacle Feeder Fund") and the Summit Fund, L.P. (the "Summit Fund," and together with the Pinnacle Feeder Fund, the "Feeder Funds"). White Oak unilaterally drafted both the limited partnership agreements ("LPA") creating the terms of the Feeder Funds and the subscription agreements

---

[1] A feeder fund is one of several sub-funds that each pool some or all of their capital into an overarching fund, known as a master fund, for which a single advisor handles all portfolio investments as a unit. *See In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 133 (2d Cir. 2015) (describing the feeder-master fund relationship). The master fund's profits are then distributed proportionately to the feeder funds based on the percentage of assets that belong to each fund.

governing the Plan's investment in those Funds, and White Oak signed those documents on behalf of the Plan. Those documents, which were not separately consented to by the Plan, contained two provisions contrary to the IMA that are relevant to this appeal.

First, as the arbitrator later determined, the Feeder Fund subscription agreements provided that the Plan's investment in the Funds could not be "cancel[ed], terminate[d,] or revoke[d]." S.App'x 26. Likewise, the Pinnacle Feeder Fund's LPA prohibited the Plan's "voluntar[y] withdraw[al]" from that Fund, nor was the Plan's interest in the Fund "redeemable or repurchasable." App'x 218. White Oak further bound the Plan's assets to its control through the Pinnacle Feeder Fund's contracts with its master fund. Just as the Plan could not voluntarily withdraw from the Pinnacle Feeder Fund, that Fund could not voluntarily withdraw from its master fund, nor would its interest in the master fund be redeemable or repurchaseable. Although the Summit Fund's LPA permitted voluntary withdrawal from the Summit Fund, whereupon White Oak would pay the withdrawing partner the value of its interest in the Fund, White Oak reserved the right to unilaterally provide that payment through a

promissory note of its own making and to set that note's interest rate and maturity date.

Second, although the IMA limited White Oak's fees to its specifically defined management fees and carried interest fees, the Pinnacle Feeder Fund's subscription agreement obligated the Plan to pay "Day One" fees to the master fund. The Day One fees were retroactive, in that White Oak charged the Pinnacle Feeder Fund for management fees as if the Plan had participated in the master fund from the latter's first day of existence, which was prior to the creation of both the Pinnacle Feeder Fund and the IMA. These fees purported to compensate White Oak for its management of the master fund prior to the Pinnacle Feeder Fund's entry into their pool of assets.

On August 17, 2015, Niemie notified the Plan that he would not renew his employment as the Plan's CIO after his contract expired on March 31, 2016. Prior to his departure, Niemie recommended that the Plan continue its investment with White Oak, as the IMA was set to expire on January 1, 2016. The Trustees accepted his recommendation, and the Plan signed a contract with White Oak, effective January 1, 2016, that renewed the IMA for an additional two years on terms substantively identical to those contained in the original agreement.

10

Unbeknownst to the Plan, Niemie was in negotiations to join White Oak as a part owner and officer during the period in which he recommended the renewal of the IMA. On March 31, 2016, Niemie joined White Oak; the Plan did not discover that affiliation until several months later. Suspicious of the timing of these events, the Trustees decided to investigate the performance of Niemie's recommendations, including the Plan's investments with White Oak.

During that review, the Trustees grew concerned that White Oak had collected fees that violated the terms of the IMA. The Trustees and White Oak exchanged letters regarding the fees, whereupon the Trustees demanded that White Oak turn over documents corroborating its assertions. White Oak's responses did not satisfy the Trustees.

On December 18, 2017, White Oak instead provided ninety day notice of its unilateral termination of the IMA. White Oak's termination letter stated that, after the notice period, the Plan's investment with White Oak would be governed by the Feeder Fund documents instead of the IMA. In effect, White Oak would retain management of the Plan's assets. Although the Plan could appoint a new investment manager to oversee the Feeder Funds, the assets in the Pinnacle Feeder Fund were bound to the master fund operated by White Oak, and White

11

Oak retained the option to provide a promissory note to the Plan rather than returning the assets in the Summit Fund.

On December 27, 2017, the Plan exercised its contractual right to extend the IMA for a six-month period or until it selected a successor investment manager. On July 31, 2018, the Plan filed a demand for arbitration pursuant to the IMA's arbitration clause, seeking, among other relief, the return of its investment.

On September 18, 2018, the six-month extension of the IMA expired. That same day, White Oak informed the Plan in writing that it intended to "treat the IMA as if it were still in effect" and would "maintain the status quo and continue to provide the same services to the Plan, including . . . the same fee arrangement as set forth in the [IMA]" unless it "receive[d] other instructions." S.App'x 16–17. However, the Plan sought the return of its assets, rather than the appointment of a new investment manager to oversee the Feeder Funds subject to White Oak's control over the master funds, and therefore continued to arbitrate the dispute.

## II.     The Arbitration

As provided by the IMA, the parties proceeded to arbitration before the American Arbitration Association. After discovery, the arbitrator held a week-long hearing in December of 2019.

12

## A.    The Partial Final Award

On November 30, 2020, the arbitrator issued a Partial Final Award

("PFA"), which concluded that White Oak had used its delegated authority to

grant itself several benefits that were contrary to the terms of the IMA. Critically,

the "language of the IMA . . . govern[ed] the relationship between the Plan and

White Oak," and White Oak owed a fiduciary duty to the Plan to comply with its

terms. S.App'x 17–18. Accordingly, White Oak's repeated noncompliance with

the IMA's terms demonstrated that it had "engaged in numerous prohibited

transactions" in violation of ERISA. *Id*. at 17.[2]

First, White Oak had failed to return the Plan's property and assets within

thirty days of its unilateral termination of the IMA, contrary to the clear

provisions of the IMA requiring White Oak to do so. Likewise, the IMA did not

authorize White Oak's continued collection of fees after it had retained the assets,

and therefore the post-termination management fees were improper. Because the

IMA's return provision was self-executing, White Oak's actions were unlawful

---

[2] The arbitrator determined that White Oak had committed several other breaches of its ERISA fiduciary duty in addition to those enumerated below, such as White Oak's unilateral grant of indemnification rights to itself from the Plan's assets within the Feeder Fund documents. However, those violations are not contested during this appeal and have therefore been omitted from our discussion.

even though the Plan had failed to make a formal request for the return of its assets.

Second, White Oak had abused its fiduciary authority by imposing "exit requirements [in the Feeder Fund documents] that were contrary to those found in the IMA," as the IMA provided that White Oak could not "waiv[e] any of the obligations . . . under this Agreement." S.App'x 24–25. The arbitrator explained that those documents prohibited the Plan from withdrawing its assets and instead granted White Oak the authority "to refuse to return the Plan's cash and . . . assets and instead substitute an interest-bearing note, at a rate of White Oak's determination." *Id*. at 26. By contrast, the IMA gave the Plan the right to terminate its investment "at any time . . . without penalty" and required White Oak to return all of the Plan's "accounts, cash, securities[,] . . . and all other property" in the event that either party terminated the agreement. *Id*. at 19, 25.

Moreover, the arbitrator concluded that White Oak's unilateral imposition of withdrawal restrictions in the Feeder Fund documents violated ERISA even apart from their inconsistency with the IMA, as those restrictions "resulted in [White Oak's] ability to control Plan assets and earn fees on the assets" after the IMA's termination. S.App'x 24. Upon termination, the restrictions presented the

14

Plan with an unpalatable option. The unilateral promissory note provision "force[d]" the Plan to "underwrite a loan to White Oak in the amount of its investment, and to wait for the redemption at a time and a rate set by White Oak." *Id*. at 27. Meanwhile, the non-termination provision ensured that the Plan's "assets remain[ed] under the control of White Oak." *Id*.

The arbitrator rejected White Oak's argument that the Plan was not harmed by those withdrawal restrictions because the Plan had not sought to exit the Feeder Funds, reasoning that White Oak's creation of the unauthorized restrictions violated the IMA and ERISA regardless of whether White Oak had actually enforced them. Nor did the arbitrator credit White Oak's argument that "the IMA does not require that it return the Plan's 'cash' and 'other property' because '[those items] are not in White Oak's physical possession,'" as this too contradicted the clear terms of the IMA permitting the Plan to "exit with its assets 'without notice.'" S.App'x 27. "If the Plan's money is no longer in White Oak's possession," the arbitrator reasoned, "then it is incumbent upon it to borrow it." *Id*.

Third, the PFA found that White Oak's collection of the Day One fees under the Pinnacle Feeder Fund subscription agreement violated the IMA, which

limited White Oak's "sole compensation" to the management and carried interest fees defined within the IMA's fee schedule. S.App'x 30. White Oak's authority to draft the Feeder Fund documents did not permit it to unilaterally impose the Day One fees, as "the terms of the IMA, and not the Fund terms, . . . govern the conduct of White Oak." *Id*. Nor could the Day One fees be implied into the IMA as authorized management fees, because "White Oak could not have provided any fiduciary services before the IMA was in effect." *Id*. And while the IMA stated that White Oak could collect other fees with "prior express written consent of the [Plan's] Trustees," White Oak did not obtain that consent. *Id*.

Although the arbitrator reserved a calculation of damages for a "collateral proceeding," the PFA concluded by awarding the following relief. S.App'x 37. First, the PFA ordered White Oak to disgorge the "NAV [net asset value] of [the Plan's] investments, . . . [White Oak's] profits, and any fees White Oak collected, including all Day One fees, from the time White Oak first collected any fees from the Plan until the date that assets are returned to the Plan." *Id*. The PFA elaborated that "profits" were those benefits "made through use of assets of the Plan," and that "[i]f White Oak placed Plan assets and other compensation into companies in which they owned equity interests, the [damages proceeding]

16

should reveal such conduct." *Id*. at 38 (internal quotation marks omitted). The PFA further explained that White Oak "is not entitled to continue to charge and retain fees for services provided after its termination of the IMA." *Id*. Second, the PFA ordered White Oak's removal as the Plan's fiduciary and investment manager upon the Plan's retention of a replacement manager. *Id*. Third, the PFA awarded the Trustees their attorneys' fees, as well as prejudgment interest at the New York statutory rate of nine percent. *Id*. at 38–39.

## B. Damages Proceedings

After issuing the PFA, the arbitrator conducted further proceedings to calculate damages. The arbitrator ordered White Oak and the Plan to jointly select a third party expert to determine the damages owed to the Plan. White Oak refused to comply, claiming that this procedure went beyond the scope of the arbitrator's authority under the AAA's rules. Although the arbitrator would ultimately reject this argument, both parties had, in the interim, hired their own experts to calculate damages. Given White Oak's "lack of compliance," instead of insisting on the joint selection of a damages expert, the arbitrator chose to receive the parties' competing experts' reports, set a hearing date for their testimony, and

review additional briefing. S.App'x 48. As relevant to this appeal, the parties disputed three issues during the damages phase.

First, the Plan calculated the disgorgement remedy based on the value of its assets as of September 30, 2018, the first date for which financial statements were available after the IMA expired following its six-month extension, plus prejudgment interest from that date forward. White Oak likewise calculated prejudgment interest running from September 30, 2018 and did not propose any competing interest accrual date. However, White Oak argued that, notwithstanding this calculation, it should not be held liable for interest because the Plan had earned profits from White Oak's continued management of the Plan's assets after the termination date. In its view, an award of interest would result in an unfair "windfall" to the Plan. App'x 397.

Second, White Oak objected to the disgorgement of certain fees required by the PFA. White Oak argued that it should retain the Day One fees because the Plan had received a net gain from a simultaneous profit distribution by the Pinnacle master fund. White Oak also argued that it should retain the management fees that it had collected from the Plan after the IMA's termination,

given that it had attempted to return the Plan's investment account to the Plan in September 2018 and received no response on how to do so.

Third, the parties disagreed about the proper form of disgorgement for the Plan's assets. White Oak maintained that it should be permitted to make an in-kind transfer of the Plan's fractional interest in the debt securities held by the Feeder Funds. The Trustees objected to this distribution and sought an all-cash disgorgement, as White Oak's proposal would result in its continued control over the Plan's assets through White Oak's ownership of the remaining interests in the debt securities.

### C. The Final Award

On August 4, 2021, after reviewing the parties' submissions, the arbitrator issued a "Final Award" ("FA") (together with the PFA, the "Award"). S.App'x 41. The FA began by noting that "the merits of this matter were heard [previously] . . . and a Partial Final Award . . . was issued." *Id*. The FA then stated that it "hereby incorporated [the PFA] into this instant Final Award." *Id*.

After rejecting a slew of procedural arguments raised by White Oak in opposition to the award, the FA turned to the merits. The arbitrator emphasized that "[t]he reasons governing the finding that [White Oak] must disgorge all

19

assets, and some fees, and profits, are more fully set forth in the [PFA] and will not be repeated in this section, excepting a few points, as the focus will be on the actual computation of the damages amount due." S.App'x 46.

The FA then observed that the parties' submissions "on the issue of damages [had] clarified the issues presented," and therefore "certain areas of the PFA . . . have been modified to update the award, to reflect the evidence revealed . . . during the post-PFA period." S.App'x 48. Specifically, "[t]hat evidence demonstrates that White Oak unsuccessfully attempted in writing to return the [Feeder] Funds to the Plan" after the IMA's termination and had notified the Plan that it would otherwise "continue investing the money in the same manner and for the same charges" until "the Plan advise[d] White Oak of its successor investment manager or [was] ready to receive the funds itself." *Id*. at 49. Accordingly, the FA determined that "White Oak should not be penalized for the Plan's lack of action in notifying [White Oak]" that the Plan had "some other means of handling its funds." *Id*.

The FA then turned to the proper form for the disgorgement of the Plan's assets and rebuffed the positions of both parties. S.App'x at 49. Although the arbitrator concluded that the IMA did not require an "all-cash" distribution, she

also rejected White Oak's proposed in-kind distribution and emphasized that White Oak must find liquidity if necessary to fulfill its obligations. *Id*. at 49–50 ("[I]t is irrelevant whether the 'cash' to be returned is currently encumbered by White Oak[] or [its] clients or is not readily available as it is not the Plan's burden to locate the source of such funding.").

The FA concluded by ordering the following relief:

1. The PARTIAL FINAL AWARD dated November 30, 2020 is hereby incorporated within this FINAL AWARD.

2. WHITE OAK shall disgorge the NAV of the Plan, which may not include all cash, as of [the] date of this FINAL AWARD. Disgorgement, including interest, shall take place no later than 30 calendar days after the issuance of this Award unless the parties agree otherwise.

3. PERFORMANCE FEES shall be retained by White Oak and not be returned to the Plan as they constitute reimbursement for managing the business and affairs of Pinnacle and Summit, rather than profits of White Oak.

4. ATTORNEYS' FEES AND COSTS as proposed by the Plan, shall be reduced by 20% . . . . No interest shall be paid with respect to attorneys' fees and costs owed.

5. PRE-JUDGMENT INTEREST is awarded at the New York statutory rate of 9%.

. . .

9. All claims not expressly granted herein are DENIED.

S.App'x 50–51.

## III.    District Court Proceedings

Despite the issuance of the PFA and FA, the parties continued to dispute the proper form and amount of White Oak's obligations. White Oak again offered fractional shares of the securities held by its funds, which the Trustees again rejected. On October 8, 2021, the Trustees filed the instant petition to confirm the award in the District Court for the Southern District of New York. White Oak cross-petitioned to vacate the award in part.

### A.    Confirmation of the Award

On March 17, 2022, the district court granted the Trustees' petition to confirm the Award in "all respects," subject to clarification of the Award to permit White Oak to retain the IMA's "management fees" as constituting the "performance fees" described in the FA. *Trustees of New York State Nurses Ass'n Pension Plan v. White Oak Glob. Advisors LLC*, No. 21-cv-8330, 2022 WL 815273, at *10, *12 (S.D.N.Y. Mar. 17, 2022) ("*White Oak I*").

As a preliminary matter, the court rejected White Oak's argument that the FA completely superseded the PFA and nullified its underlying merits findings. *Id*. at 6–7. Because the "FA expressly 'incorporate[s]' the PFA" and "nothing on the face of either award component suggests that any of the FA's 'modifications'

22

go to liability," the court concluded that "[t]here is no proper basis for concluding that the PFA's liability determinations were disturbed by the FA." *Id*. Thus, the court would address the parties' arguments by reading the PFA and FA in conjunction.

With this understanding of the PFA and FA in mind, the district court turned to the disputed facets of the Award. First, the court confirmed that White Oak must disgorge the value of the Plan's assets as they stood on August 4, 2021. *Id*. at 7–8. Moreover, the court determined that the FA had rejected White Oak's proposed distribution of fractional shares in the debt securities held by its funds, as that result would permit White Oak to "remain in control of both the Plan assets that were the object of White Oak's self-dealing and of the management and disposition of the loans underlying the in-kind distribution." *Id*. at 9. Such a result would "contradict other portions of the award" and "perpetuate misconduct that the [a]bitrator determined to be an ERISA violation." *Id*.

Second, the court noted that the FA modified the PFA as to the disgorgement of fees, *id*., in that the FA permitted White Oak to retain "performance fees" that "constitute reimbursement for managing the . . . [Funds]." S.App'x at 50. The court concluded that the FA's reference to

23

"performance fee[s]" was clearly intended to refer to the IMA's "management fee[s]" rather than its "carried interest" fees, as "it [was] clear from the IMA's fee structure that only the 'management fee' can be characterized as baseline compensation for 'managing . . . business and affairs.'" *White Oak I*, 2022 WL 815273, at *9. By contrast, the carried interest fees were based on the level of returns, and therefore these fees did not constitute "reimbursement" for White Oak's services but rather "profits" that must be disgorged. *Id*. at 9–10.

Third, the court held that "it is obvious that White Oak may not retain any 'Day One' fees" under the Award. *Id*. at 10. The arbitrator determined that those fees were "a standalone ERISA violation, as the IMA unambiguously disallowed that compensation and because the Trustees did not consent otherwise in writing." *Id*.

Fourth, the court denied White Oak's request to vacate the award of attorneys' fees and prejudgment interest on the grounds that "White Oak, not the [Trustees], prevailed at the arbitration." *Id*. at 12 (internal quotation marks omitted). It was obvious that the Trustees had achieved "considerable success on the merits," and therefore the arbitrator had not manifestly disregarded the law in awarding these statutorily authorized items of relief. *Id*. at 10–12. However,

the court declined to award post-award, prejudgment interest. Although not a "penalty," such interest was not warranted for the reasons "underlying the [a]rbitrator's revisions to the PFA." *Id*. at 12 (internal quotation marks omitted).

The court then entered a final judgment, which stated that the "Plan's petition to confirm the arbitration award, consisting of the PFA and the FA and as modified by [permitting White Oak to retain its management fees], is granted in all respects." Dkt. 60.[3]

## B.  The Dispute Over the District Court's Jurisdiction

From the time the petition to confirm the award was filed until the entry of the district court's final judgment, White Oak interposed no challenge to the court's subject matter jurisdiction. The absence of such a challenge was unsurprising. Under the prevailing case law in this circuit, the district court had jurisdiction because the underlying claims presented to the arbitrator raised questions of federal law. We had interpreted the Supreme Court's decision in *Vaden v. Discover Bank,* 556 U.S. 49, 62–63 (2009), which adopted such a "look

---

[3] At the Plan's request, the court later clarified its judgment under Fed. R. Civ. Pro. 60(a). First, the court specified that White Oak would "disgorge[] the 'Day One' management fees in the amount of $1,929,836.07." S.App'x 100. Second, White Oak would disgorge the net asset value of the Plan's assets, "with prejudgment interest at 9 percent per annum running from September 18, 2018 to August 4, 2021." *Id*. Third, White Oak would disgorge its "profits." *Id*.

25

through" approach to govern jurisdiction over an action to *compel* arbitration under FAA § 4, to apply as well to actions to *enforce*, *vacate*, or *modify* arbitral awards under FAA §§ 9–11. *Doscher v. Sea Port Grp. Sec., LLC*, 832 F.3d 372, 388 (2d Cir. 2016).

After the entry of judgment in this matter, however, the Supreme Court's decision in *Badgerow* abrogated our precedent, holding that a federal court may not "look through" to the claims resolved by the arbitration to determine its jurisdiction over a petition to confirm or vacate an arbitration award. 596 U.S. at 5. Rather, the basis for jurisdiction must appear on "the face of the application itself." *Id*. at 9. In light of that decision, White Oak moved to vacate the judgment for lack of subject matter jurisdiction.

The district court rejected White Oak's challenge and determined that the petition raised two bases for federal question jurisdiction. *Trustees of New York State Nurses Ass'n Pension Plan v. White Oak Glob. Advisors, LLC*, No. 21-cv-8330, 2022 WL 2209349, at *7 (S.D.N.Y. June 20, 2022) ("*White Oak II*").

First, the court determined it had power to hear the suit under 28 U.S.C. § 1331, *id*. at 5, which provides that federal courts "shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States," 28 U.S.C.

26

§ 1331. The court observed that the arbitration agreement at issue was contained within the IMA, which created White Oak's fiduciary obligations under ERISA. *White Oak II*, 2022 WL 2209349, at *5. The court reasoned that, because contracts between ERISA plans and their fiduciaries are governed exclusively by the "federal common law" of ERISA and ERISA preempts state-law regulation of such contracts, the contractual right before the court "[wa]s not a state-law based Section 9 application as was at issue in *Badgerow*." *Id*. Rather, the Plan sought "recovery exclusively under the laws of the United States." *Id*.

Second, the court determined that enforcement of the IMA's arbitration clause, as embodied in the Award, was cognizable as an ERISA § 502(a)(3) action. That provision authorizes an ERISA "participant, beneficiary or fiduciary" to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). As held by the court, the petition sought appropriate equitable relief – the specific performance of White Oak's contractual duty to arbitrate disputes arising under the IMA. *White Oak II*, 2022 WL 2209349, at *7. The court concluded that it therefore

27

possessed jurisdiction under ERISA § 502(e)(1), *id.*, which gives federal courts "exclusive jurisdiction of civil actions under [ERISA § 502(a)(3)]," 29 U.S.C. § 1132(e)(1).

### C.   The District Court's Award of Attorneys' Fees

After entry of judgment, the Trustees moved to recover their attorneys' fees and costs for the confirmation proceeding. Relying on its inherent authority, the court granted the motion and awarded $1,654,422.27, representing the entirety of the Trustees' fees and costs incurred during the confirmation proceedings. Noting that it had "already . . . remarked in various rulings that White Oak has advanced meritless, 'entirely unpersuasive,' and even 'borderline sanctionable' positions throughout this litigation," the court "ha[d] no difficulty concluding that White Oak sought to frustrate confirmation and enforcement of the arbitral award against it with needless motions and unceasing attempts to resuscitate already-rejected arguments." S.App'x 104.

### DISCUSSION

White Oak now appeals, claiming that the district court erred by (1) exercising subject matter jurisdiction over the petition in light of *Badgerow*; (2) confirming the Award as to prejudgment interest on the disgorgement of assets,

return of the "Day One" fees, and "profits;" and (3) ordering White Oak to pay the Trustees' attorneys' fees and costs for the confirmation proceedings.

For the reasons set forth below, we hold that the district court properly exercised jurisdiction over the petition to confirm the Award. The Award arises from the arbitration agreement contained within the IMA, which is a term of or document governing the Plan. Because the Trustees seek equitable relief and are parties authorized to bring suit under ERISA § 502(c)(3), we hold that enforcement of the Award is cognizable as an ERISA § 502(c)(3) action. Accordingly, ERISA § 502(e)(1) provided the district court with jurisdiction.

As to the merits, we conclude that the Award unambiguously awarded the Trustees the return of the "Day One" fees and prejudgment interest on the disgorgement of the Plan's assets. However, we also conclude that the award of "profits" is too indefinite to enforce and therefore remand to the arbitrator for clarification and determination of the profits disgorgement.

Finally, we agree with White Oak that the district court's findings were insufficiently specific to justify its award of attorneys' fees and costs for the entirety of the confirmation proceeding. Although the record supports the district court's conclusion that White Oak advanced numerous meritless

arguments and generally attempted to obstruct execution of the award, it is also clear that White Oak prevailed on several issues. Accordingly, we remand the sanctions order to the district court to make more specific findings tailored to White Oak's conduct, in order to apportion the fee award to cover expenditures occasioned by White Oak's meritless arguments.

## I. Federal Courts have Jurisdiction over Petitions to Confirm Arbitration Awards Arising from an ERISA Contract Between Fiduciaries.

The federal courts are "courts of limited jurisdiction, defined (within constitutional bounds) by federal statute." *Badgerow*, 596 U.S. at 7. Broadly, "Congress has authorized the federal district courts to exercise original jurisdiction in 'all civil actions arising under the Constitution, laws, or treaties of the United States.'" *Gunn v. Minton*, 568 U.S. 251, 257 (2013), quoting 28 U.S.C. § 1331.[4]

In general, an action arises under federal law if a federal statute "creates the cause of action asserted." *Id*. However, the FAA does not create a cause of action in the relevant sense. Although the FAA authorizes parties to file petitions to compel arbitration and to confirm, vacate, or modify arbitral awards, it "bestow[s] no federal jurisdiction but rather requir[es] an independent

---

[4] The parties agree that the alternative basis for federal jurisdiction – diversity of citizenship – is unavailable here.

30

jurisdictional basis" over such petitions. *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581–82 (2008).

In *Vaden*, the Supreme Court announced that subject matter jurisdiction over a petition to compel arbitration under FAA § 4 is determined by the "look through" approach, whereby jurisdiction turns on the "underlying substantive controversy" to be arbitrated, even though the only controversy truly raised by the petition is the "arbitrability of the[] claims." 556 U.S. at 62–63. Restated, a federal court may hear a petition to compel arbitration if the claims to be arbitrated would have "aris[en] under" federal law as determined by the ordinary principles. *Id.* at 62. For more than a decade following *Vaden*, we, along with several of our sister circuits, concluded that the "look through" approach also extended to petitions to confirm, modify, or vacate arbitration awards under FAA §§ 9–11. *See Doscher*, 832 F.3d at 388; *see also Quezada v. Bechtel OG & C Constr. Servs., Inc.*, 946 F.3d 837, 843 (5th Cir. 2020), *abrogated by Badgerow*, 596 U.S. 1; *Ortiz-Espinosa v. BBVA Securities of P. R., Inc.*, 852 F.3d 36, 47 (1st Cir. 2017), *abrogated by Badgerow*, 596 U.S. 1. At the time the Trustees and White Oak filed their cross-petitions to confirm and vacate the Award, *Doscher* stated the law in this circuit, and neither party contested the basis for federal jurisdiction over

31

their suit. The underlying dispute exclusively involved claims asserted under ERISA, and therefore the cross-petitions plainly arose under federal law under the *Doscher* approach.

But shortly after the district court entered judgment in favor of the Trustees, the Supreme Court held that *Vaden*'s "look through" approach does not extend to petitions brought under FAA §§ 9–11, abrogating *Doscher* and its approach to jurisdictional rules under those provisions of the FAA. *Badgerow*, 596 U.S. at 1. Instead, the Court determined that, absent diversity of citizenship between the parties, jurisdiction over a petition exists only if the "face of the application" shows that "federal law (beyond Section 9 or 10 itself) entitles the applicant to relief." *Id*. at 9. Thus, *Badgerow* rendered invalid the jurisdictional basis for the action relied upon by the parties and the district court.

On appeal, as it did before the district court, White Oak seizes upon *Badgerow* to argue that the judgment should be vacated for lack of jurisdiction. We disagree. Admittedly, the Trustees can no longer assert federal jurisdiction over the petition simply because the underlying claims, in this case claims for violation of ERISA, raise a federal question – that basis is foreclosed by *Badgerow*. Nonetheless, we conclude that federal jurisdiction remains proper over the

petition because ERISA itself creates a cause of action to confirm an arbitration award under the specific circumstances here – where the Trustees seek to enforce an arbitration agreement contained within an ERISA-governed contract between two co-fiduciaries to an ERISA plan.

### A. The Contract at Issue in *Badgerow* was Governed by State Law.

As discussed above, federal question jurisdiction over a petition to confirm, modify, or vacate an award cannot be premised on the underlying claims that were arbitrated. Instead, the petition itself must "allege[] that federal law (beyond Section 9 or 10 itself) entitles the applicant to relief." *Badgerow*, 596 U.S. at 9. By this statement, the Court clearly envisioned that diversity jurisdiction would not be the sole entry point for such petitions into federal court and that some FAA §§ 9–11 petitions would present federal questions. However, "no examples of the latter are supplied in *Badgerow* itself." *Bissonnette v. LePage Bakeries Park St., LLC*, 49 F.4th 655, 666 (2d Cir. 2022) (Jacobs, J., concurring), *vacated on other grounds by* 144 S. Ct. 905 (2024).

Nevertheless, one principle is apparent. The award at issue in *Badgerow*, which resolved the petitioner's Title VII claims against her employer, was arbitrated pursuant to a clause in the petitioner's employment contract. 596 U.S.

at 5. As the Court recognized, the sole dispute before it was the "enforceability of an arbitral award," which "is no more than a contractual resolution of the parties' dispute." *Id*. at 9. Applications to enforce arbitral awards concern solely "the contractual rights provided in the arbitration agreement, [which are] generally governed by state law." *Id*. at 18. "[A]djudication of such state-law contractual rights – as [with the] non-arbitration settlement of federal claims – typically belongs in state courts" when the petition "raise[s] claims between non-diverse parties." *Id*.

Implicit in the Court's reasoning is that the petitioner's arbitration agreement, stemming from her employment contract, was subject to the ordinary rule that claims to enforce contracts are governed by state law. For that reason, the Court did not need to consider in detail whether the petition at issue raised a federal question "on the face of the application itself," because the contractual rights asserted plainly did not. *Id*. at 9.

### B. The Contractual Right at Issue Here Derives from an ERISA Contract Governed by Federal Law.

At the outset, White Oak contends that a petition to confirm an award enforces freestanding contractual rights created by the award itself, rather than the rights created in the arbitration agreement. Although *Badgerow*'s statement

34

that confirmation of an award "concerns the contractual rights provided in the arbitration agreement" seemingly forecloses this argument, White Oak argues that this passage should be read as pure dicta explaining the Court's policy concerns. *Id.* at 18. We reject that argument.

An arbitral award creates no contractual rights and has no force independent of an arbitration agreement, for the simple reason that an award is not a contract. The parties to an award make no promises within it.[5] Nor do the parties mutually assent to the terms of the award.[6] Indeed, the parties do not even know the terms of the award until the arbitrator announces them, and, as this case amply demonstrates, often bitterly disagree with that award once it is issued. Rather, an award has legal force only because the parties have elsewhere promised to be bound by it, and those mutual promises are found in the arbitration agreement.

The FAA itself reinforces the conclusion that a § 9 petition "concerns the contractual rights provided in the arbitration agreement." *Badgerow*, 596 U.S. at 18. An award may be confirmed only "[i]f the parties in their agreement have

---

[5] Restatement (Second) of Contracts § 1 (1981) ("A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.").

[6] Restatement (Second) of Contracts § 3 (1981) ("An agreement is a manifestation of mutual assent on the part of two or more persons.").

35

agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration." 9 U.S.C. § 9. Thus, an award is not enforceable under the FAA merely because it exists and on its face purports to bind the parties to the arbitration. Rather, with few exceptions, an award has legal effect only if the parties have entered into an agreement to submit their dispute to arbitration. *See Idea Nuova, Inc. v. GM Licensing Group, Inc.*, 617 F.3d 177, 180 (2d Cir. 2010) ("[T]he FAA provides for judicial confirmation of arbitral awards [only] on consent of the parties."); *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Custom Air Sys., Inc.*, 357 F.3d 266, 267–68 (2d Cir. 2004) (non-signatory to arbitration agreement could not be bound by arbitration award absent finding by district court that it was the alter ego of a signatory). Indeed, even where an award results from a properly executed arbitration agreement between its parties, the award remains unenforceable where the arbitrator has exceeded her authority by "reaching issues clearly prohibited . . . by the terms of the parties' agreement." *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir. 2011); *Katz v. Feinberg*, 290 F.3d 95, 97–98 (2d Cir. 2002) (holding that the arbitrators had exceeded their authority by reaching an issue that the agreement exclusively committed to independent accountants, not the arbitrators).

We therefore see nothing in *Badgerow* inconsistent with our longstanding recognition that a petition to confirm an award does not vindicate the award itself, but rather enforces the parties' agreement to arbitrate and abide by the resulting award. *See I/S Stavborg v. Nat'l Metal Converters, Inc.*, 500 F.2d 424, 426 (2d Cir. 1974) ("One purpose of [FAA § 9] is to ensure that the parties have affirmatively agreed to the application of the federal substantive law contemplated by the Act *to the interpretation of the arbitration agreement*.") (emphasis added).

In sum, *Badgerow* instructs that subject matter jurisdiction over a petition to confirm an award turns on the law governing the contractual rights created by the arbitration agreement, rather than the laws asserted in the underlying claims or the non-existent "freestanding" rights created solely by the award. Because contracts are "typically" and "generally" creatures of state law, *Badgerow*, 596 U.S. at 9, 18, an action to enforce an arbitration contract through confirmation of its resulting award ordinarily does not arise under federal law. Nonetheless, we agree with the district court that *this* arbitration agreement, which is the basis for the federal ERISA claim in the petition, presents exactly such an exception.

37

## 1.   ERISA

To understand the "contractual rights provided in the arbitration agreement" before us, *id*. at 18, it is necessary to take a detour into substantive ERISA principles. "ERISA abounds with the language and terminology of trust law," and its "legislative history confirms that the Act's fiduciary responsibility provisions . . . codify and make applicable to ERISA fiduciaries certain principles developed in the evolution of the law of trusts." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989) (internal alterations adopted and quotation marks omitted). Given the "language and history" of ERISA, it is well settled that Congress has authorized the federal courts "to develop a federal common law of rights and obligations under ERISA-regulated plans." *Id*. (internal quotation marks omitted). This grant of authority extends not only to "address[ing] the relationships among fiduciaries," *Chemung Canal Tr. Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 18 (2d Cir. 1991), but also to the contractual "[i]nterpretation of the terms of an ERISA pension plan," *Aramony v. United Way of Am*., 254 F.3d 403, 411 (2d Cir. 2001); *see also Critchlow v. First UNUM Life Ins. Co. of Am*., 378 F.3d 246, 255 (2d Cir. 2004) (analyzing contractual language of ERISA insurance policy under federal common law). In other words, ERISA creates a federal common law of both trusts and of contracts as applied to ERISA-regulated plans.

The Trustees of the Plan are "named fiduciaries" under the Plan's governing documents. 29 U.S.C. § 1102(a). As authorized by ERISA § 402(c)(3), the Plan's trust documents permitted the Trustees to appoint White Oak as the Plan's investment manager. 29 U.S.C. § 1102(c)(3). In turn, White Oak assumed fiduciary duties to the plan by acknowledging, as required by ERISA § 3(38), "in writing that [it] is a fiduciary with respect to the plan." 29 U.S.C. § 1002(38)(C). That writing, of course, was the IMA, which contains the arbitration agreement at issue.

In turn, ERISA § 404(b) required White Oak and the Trustees to discharge their duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D); *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Commission of Nassau County, Inc.*, 710 F.3d 57, 69 (2d Cir. 2013) (A fiduciary's "breach of a contractual obligation in the Plan documents constitutes a breach of their fiduciary duties under § 404(a)(1)."). As we have long recognized, the investment management agreement contemplated by ERISA § 3(38) is a document that governs the plan, such that non-compliance with its terms is a breach of fiduciary duty. *See Dardaganis v. Grace Cap. Inc.*, 889 F.2d 1237, 1240–43 (2d Cir. 1989) (concluding that investment management agreement

is a "plan document," and investment manager's failure to comply with the plan's investment guidelines, as required by the agreement, was a breach of its fiduciary duty under ERISA § 404(a)(1)(D)). Closing the circle, the IMA's dispute resolution provision – *i.e.,* its arbitration clause – is precisely the kind of contractual term that constitutes part of an ERISA plan. *Pegram v. Herdrich*, 530 U.S. 211, 223 (2000) ("Rules governing collection of premiums, definition of benefits, submission of claims, and *resolution of disagreements* over entitlement to services are the sorts of provisions that constitute a plan.") (emphasis added).

Therefore, the arbitration agreement that the Trustees seek to enforce is not some separate instrument governed by an entirely different body of state contract law, but rather is an integral part of the documents governing the Plan and is governed by ERISA. *Smith v. Bd. of Directors of Triad Mfg., Inc.*, 13 F.4th 613, 618 (7th Cir. 2021) (concluding that, because "interpretation of language in a plan governed by ERISA is controlled by federal common law," interpretation of an arbitration agreement within a plan is also governed by federal common law) (internal quotation marks omitted). Moreover, ERISA imposed a fiduciary obligation upon White Oak to comply with the IMA's arbitration term and the FAA review for which it provided.

## 2. ERISA Express Preemption

Not only does the federal common law of ERISA govern the IMA, but it also preempts any state laws that purport to do so. Congress enacted ERISA to "protect . . . the interests of [plan participants and beneficiaries] . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries . . . , and by providing for . . . ready access to the Federal courts." 29 U.S.C. § 1001(b). In line with that intent to create a "uniform regulatory regime over employee benefit plans" and "ensure that employee benefit plan regulation would be exclusively a federal concern," *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (internal quotation marks omitted), Congress included a sweeping express preemption provision declaring that ERISA "shall supersede any and all State laws . . . [that] relate to any employee benefit plan," 29 U.S.C. § 1144(a).

Recognizing that the text of this provision "is so expansive . . . as to afford no meaningful limitation," the federal courts have developed several tests that give content to the scope of ERISA preemption. *Stevenson v. Bank of New York Co.*, 609 F.3d 56, 59 (2d Cir. 2010). The Supreme Court has instructed that "a state law relates to an ERISA plan if it has a connection with or reference to such a plan." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001) (internal quotation marks omitted). "A law refers to ERISA if it acts immediately and exclusively upon

ERISA plans or where the existence of ERISA plans is essential to the law's operation." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 88 (2020) (internal quotation marks omitted).[7] Meanwhile, a state law has an "impermissible connection with an ERISA plan" if it "governs a central matter of plan administration or interferes with nationally uniform plan administration," *id*. at 87 (internal quotation marks omitted), or "provid[es] alternative enforcement mechanisms" to ERISA, *Liberty Mut. Ins. Co. v. Donegan*, 746 F.3d 497, 506 (2d Cir. 2014) (internal quotation marks omitted), *aff'd sub nom. Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312 (2016).

The touchstone of the preemption analysis is congressional intent, as guided by two presumptions. *Gerosa v. Savasta & Co.*, 329 F.3d 317, 323 (2d Cir. 2003) (internal quotation marks omitted). First, we begin with the baseline presumption that ordinarily, "Congress does not intend to supplant state law." *Id*. (internal quotation marks omitted). Second, however, ERISA typically does preempt state laws that "control or supersede central ERISA functions" or "affect the relationships among the core ERISA entities: beneficiaries, participants, administrators, employers, trustees and other fiduciaries." *Stevenson*, 609 F.3d at

---

[7] Because state contract laws enforcing arbitration agreements and awards apply generally to all manner of parties and do not depend on the existence of an ERISA plan, such laws do not "relate to" ERISA.

59 (internal quotation marks omitted); *see also Donegan*, 746 F.3d at 507 (The Supreme Court has "reiterate[d] that 'ERISA is expressly concerned' with 'reporting, disclosure, fiduciary responsibility, and the like.'"), quoting *California Div. of Labor Standards Enforcement v. Dillingham Construction*, 519 U.S. 316, 330 (1997). State laws that do not touch on these concerns will generally evade preemption.

Given these principles, we have no trouble concluding that ERISA preempts state law as to the enforcement of arbitration agreements between core ERISA entities contained within plan documents or terms. As applied here, the Trustees are named fiduciaries to the Plan as provided in the Plan's establishing instrument, and are therefore "core ERISA entities." *Stevenson*, 609 F.3d at 59 (internal quotation marks omitted); *see* 29 U.S.C. § 1102(a)(1) ("Every employment benefit plan shall be established and maintained pursuant to a written instrument" that "provide[s] for one or more named fiduciaries."). The same is true of White Oak, which assumed a co-fiduciary role as the Plan's investment manager pursuant to the IMA. ERISA contains numerous provisions defining the role of investment managers as fiduciaries and "was deliberately structured so that legal responsibility for management of ERISA plans would be

clearly located." *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1218 (2d Cir. 1987); *see also* 29 U.S.C. §§ 1002(38), 1102(c)(3).

Likewise, the fiduciary duties created by the IMA touch upon one of the "primary concern[s]" of Congress in enacting ERISA, namely the "mismanagement of funds accumulated to finance employee benefits." *California Div. of Labor Standards Enforcement*, 519 U.S. at 326–27 (internal quotation marks omitted); *see also Donegan*, 746 F.3d at 508 ("ERISA preempts state laws dealing with the subject matters covered by ERISA—reporting, disclosure, fiduciary responsibility, and the like.") (internal quotation marks and emphasis omitted).

Moreover, where the plan documents or terms provide for a process by which fiduciary duty disputes shall be resolved, we think it obvious that such dispute resolution provisions involve the "actual administration" of a plan. *See Herdrich*, 530 U.S. at 223 (noting that dispute resolution rules "are the sorts of provisions that constitute a plan."); *cf. Stevenson*, 609 F.3d at 61 (concluding that contract and promissory estoppel claims were not preempted because they derived from a separate promise and did not allege breach of a "fiduciary duty or plan provision.").

We emphasize that "a contractual agreement to arbitrate . . . does not constitute a 'State law'" subject to ERISA preemption, *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 395 (2002) (Thomas, J., dissenting), such that ERISA claims are not generally arbitrable. Nor do we suggest that federal jurisdiction arises over an arbitral award merely because it resolves ERISA claims – as *Badgerow* instructs, those underlying disputes cannot be the basis for federal question jurisdiction. 596 U.S. at 9. Rather, we hold only that ERISA forbids states from applying laws inconsistent with ERISA when enforcing an arbitral agreement contained within an ERISA plan document or term. *Rush Prudential*, 536 at 381–82 (noting that a state cannot "impos[e] an alternative scheme of arbitral adjudication at odds with the manifest congressional purpose to confine adjudication of disputes to the courts").

In short, this case presents two ERISA fiduciaries, disputing the enforcement of a contractual provision – the agreement to arbitrate – governed by ERISA common law and whose performance is an ERISA fiduciary duty.[8]

---

[8] For the reasons set forth above, we find the present case distinguishable from *Hursh v. DST Systems, Inc.*, in which the Eighth Circuit concluded that it lacked federal question jurisdiction to confirm the petitioners' arbitration awards resolving their underlying ERISA claims. 54 F.4th 561 (8th Cir. 2022). There, the petitioners' "sought relief under" an arbitration agreement that was "a part of their *employment contracts* [and] that specifically exclude[d] claims for 'ERISA-related benefits' under [their employer's] plan." *Id*. at 564 (emphasis added). The

However, ERISA express preemption, and its displacement of state contract law with federal common law, does not create "arising under" jurisdiction. *Wurtz v. Rawlings Co., LLC*, 761 F.3d 232, 238 (2d Cir. 2014).[9] A federal express preemption defense to a state law claim must be raised in and decided by the state courts. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392–93 (1987). Furthermore, the Supreme Court has repeatedly emphasized that ERISA's "carefully crafted and detailed enforcement scheme" demands that the statute's express remedies should remain exclusive. *Great–West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 209–10 (2002) (internal quotation marks omitted). Thus, "we are not free to fill in unwritten gaps in ERISA's civil remedies by reading into the statute additional [implied] causes of action derived from federal common law." *Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Gerber Life Ins. Co.*, 771 F.3d 150, 154 (2d Cir. 2014), citing *Great–West*, 534 U.S. at 209–10.

state contract law governing the arbitration agreements therefore was "not state contract law that 'relates'" to the ERISA Plan, as, under the Eighth Circuit's precedents, "ERISA preemption [does not] apply to the resolution of contractual disputes between an employer and a single, salaried employee." *Id*. at 564–65. By contrast, the present dispute is between two ERISA co-fiduciaries whose arbitration agreement arises from *an ERISA-governed contract*.

[9] As explained further below, ERISA's enforcement provisions create a second form of preemption – complete preemption – that "wholly displaces [certain] state-law cause[s] of action." *Davila*, 542 U.S. at 207 (internal quotation marks omitted). In contrast to express preemption, ERISA "complete preemption can be the basis for federal subject-matter jurisdiction." *Wurtz*, 761 F.3d at 238.

Therefore, for jurisdiction to be proper, the petition to confirm must state a cause of action contained within ERISA or another federal statute. For the reasons explained below, we conclude that ERISA § 502(a)(3) contemplates enforcement of a petition to confirm an arbitral award in the circumstances before us here.[10] Although we cannot supplement the remedies available under ERISA by creating new causes of action, we must give effect to the full scope of ERISA's existing remedies. *Sereboff v. Mid Atlantic Medical Servs., Inc.*, 547 U.S. 356, 368–69 (2006) (concluding that plaintiff's claim could proceed even though ERISA does not authorize a "freestanding action for equitable subrogation," as § 502(a)(3)'s provision for "equitable relief" encompasses an "action to enforce an equitable lien established by agreement.").

C.     **The Agreement May be Enforced as an ERISA § 502(a)(3) Claim.**

ERISA § 502(a)(3) authorizes a civil action by a plan "participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any

---

[10] Because we locate federal jurisdiction on the narrower grounds advanced by the district court, we do not reach its broader theory that federal question jurisdiction lies over any FAA § 9-11 petition seeking to enforce an arbitration agreement whose contractual rights are "governed exclusively by federal law." *White Oak II*, 2022 WL 2209349, at *5.

provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

ERISA § 502(e)(1) further provides that the federal courts "shall have exclusive jurisdiction of civil actions . . . brought by . . . a participant, beneficiary, or fiduciary" under § 502(a)(3). 29 U.S.C. § 1132(e)(1).

As discussed above, the IMA is one of the "terms" and "documents" governing the plan, and thereby imposed a fiduciary duty upon White Oak to act in accordance with its provisions. *Dardaganis*, 889 F.2d at 1240–43.[11] We therefore think it obvious that the Trustees' petition to confirm is an action to "enforce any provisions of [ERISA] or the terms of the plan." 29 U.S.C. § 1132(a)(3).[12] ERISA expressly contemplates the enforcement of contracts – it "provides for equitable remedies to *enforce plan terms*, so the fact that the action involves a breach of

---

[11] We note that enforcement of the IMA's arbitration clause might therefore also be cognizable under ERISA § 502(a)(2), which permits an action by "a participant, beneficiary or fiduciary for appropriate relief under section 1109." Section 1109, in turn, provides that a fiduciary who "breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries . . . shall be personally liable [for] . . . any losses to the plan resulting from each such breach . . . and such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a).

[12] Although the district court did not address this issue, it is a necessary element of a § 502(a)(3) action. Section 502(a)(3) "does not, after all, authorize 'appropriate equitable relief' at large, but only 'appropriate equitable relief' for the purpose of 'redress[ing any] violations or . . . enforc[ing] any provisions' of ERISA or an ERISA plan." *Mertens v. Hewitt Associates*, 508 U.S. 248, 253 (1993) (alterations in original and emphasis omitted), quoting 29 U.S.C. § 1132(a)(3). Nonetheless, the Trustees' petition satisfies this element.

contract can hardly be enough to prove" that the action falls outside of the scope

of § 502(a)(3). *Sereboff*, 547 U.S. at 363 (emphasis in original). As we have

recognized, "pursuant to Section 502(a)(3), a 'participant, beneficiary, or

fiduciary' of the plan may bring a civil action to . . . bring fiduciaries into

compliance with the governing plan documents." *Massaro v. Palladino*, 19 F.4th

197, 209 (2d Cir. 2021). Thus, where the arbitration agreement is contained within

"a document[] . . . governing the plan" or constitutes a "term[] of the plan,"

ERISA § 502(a)(3) provides a cause of action to enforce an award arising from

that agreement so long as the petition satisfies the other limitations on § 502(a)(3)

actions. 29 U.S.C. §§ 1104(a)(1)(D), 1132(a)(3).

The case law arising under the Labor Management Relations Act

("LMRA") further strengthens our conclusion that ERISA confers a cause of

action and jurisdiction to enforce certain arbitration agreements. Section 301 of

the LMRA provides jurisdiction over "[s]uits for violation of contracts between

an employer and a labor organization," 29 U.S.C. § 185(a), and it is well

established that this provision authorizes courts to enforce or vacate labor

arbitration awards. *See Textile Workers Union of America v. Lincoln Mills of Alabama*,

353 U.S. 448, 450–51 (1957) (holding that the LMRA grants broad authority to

enforce arbitration agreements). As the Sixth Circuit has explained after

*Badgerow*, "refusal to comply with a labor-arbitration award is itself a contract

violation over which the LMRA grants jurisdiction," and thus a petition to

confirm or vacate a labor-arbitration award possesses an "independent basis for

jurisdiction that's clear" on the face of the petition. *Greenhouse Holdings, LLC v.*

*Int'l Union of Painters & Allied Trades Dist. Council 91*, 43 F.4th 628, 631 (6th Cir.

2022). The same logic holds true for ERISA § 502(a)(3), which authorizes suits to

enforce plan terms or documents – *i.e.*, contracts. Where the arbitration

agreement is a plan term or contained in a plan document, refusal to comply

with a resulting award is a contractual violation redressable under ERISA.[13]

Moreover, it is well settled that the Trustees are "fiduciaries," as that term

is used in § 502, who are authorized to bring claims under the ERISA provisions

permitting civil actions by fiduciaries. *Montanile v. Board of Trustees of Nat.*

---

[13] We emphasize that, while we now hold that ERISA permits enforcement of certain arbitral awards, ERISA does not create a different standard for enforcement or vacatur of an award than that provided for by the FAA. 29 U.S.C. § 1144(d) (ERISA shall not "be construed to alter . . . or supersede any law of the United States."). ERISA merely requires enforcement of the contract according to its terms, and by including an arbitration agreement within their contract, the parties to the agreement have "agree[d] that a federal court would have authority to confirm the award under the standards provided in the FAA" and thus "effectively incorporated FAA review into their contract." *Zurich American Insurance Co. v. Team Tankers A.S.*, 811 F.3d 584, 590 (2d Cir. 2016).

*Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 142, (2016); *see also Lowen*, 829 F.2d at 1212 (concluding that ERISA § 502(e)(1) provided subject matter jurisdiction over action by trustees against investment manager for violations of fiduciary duty). Thus, as the district court correctly determined, whether the Trustees' petition states an ERISA § 502(a)(3) claim turns primarily on whether it seeks relief that can be understood as "equitable." *White Oak II*, 2022 WL 2209349, at *6.

### 1.     The Plan Seeks Equitable Relief.

As the Supreme Court has explained, "equitable relief in § 502(a)(3) is limited to those categories of relief that were typically available in equity during the days of the divided bench." *Montanile*, 577 U.S. at 142 (internal quotation marks and emphasis omitted). Here, the Trustees' petition was brought against a co-fiduciary to the Plan, and sought the "disgorgement" of management fees, return of the Plan's assets held by White Oak, and "[r]emoval of White Oak as the plan's fiduciary and investment manager." App'x 25. Removal of a fiduciary – like removal of a trustee – is a quintessential form of equitable relief. Restatement (Second) of Trusts § 199 (the beneficiary of a trust can maintain a suit for equitable relief to remove the trustee).

The claims for disgorgement are likewise equitable, regardless of the fact that the Trustees have alleged a breach of contract (the IMA's arbitration clause)

51

and seek monetary recovery thereunder. "ERISA provides for equitable remedies *to enforce plan terms*, so the fact that the action involves a breach of contract can hardly be enough to prove relief is not equitable." *Sereboff*, 547 U.S. at 363 (emphasis in original). Rather, whether relief "is legal or equitable depends on (1) the basis for the plaintiff's claim and (2) the nature of the underlying remedies sought." *Id*. (internal alterations adopted and quotation marks omitted).

The Supreme Court's holding in *CIGNA Corp. v. Amara* decisively answers these questions in favor of the Trustees. 563 U.S. 421 (2011). In that case, the Court addressed an attempt by plan beneficiaries to enforce a summary plan description issued by the plan. *Id*. at 438. The Court concluded that such a document did not "constitute the terms of the plan" that could be enforced under ERISA § 502(a)(1)(b) (authorizing suits by a "participant or beneficiary . . . to recover benefits due to him under the terms of his plan"). *Id*. (emphasis omitted). Nonetheless, the document could be enforced by an action for equitable relief under § 502(a)(3). *Id*. at 442.

The Court began by taking great pains to distinguish claims of fiduciary breach against plan fiduciaries from its prior decisions, which had imposed

certain limits on claims brought against non-fiduciaries[14] or plan beneficiaries.[15]

*Id*. at 439. Because the plaintiffs in *Amara* brought suit "against a plan fiduciary

(whom ERISA typically treats as a trustee) about the terms of a plan (which

ERISA typically treats as a trust)," the Court readily concluded that the basis of

the claim was equitable. *Id*. As the Court explained, that "kind of lawsuit . . .

could have [been] brought only in a court of equity, not a court of law." *Id.*, citing

4 A. Scott, W. Fratcher, & M. Ascher, *Trusts* § 24.1, p. 1654 (5th ed. 2007) ("Trusts

are, and always have been, the bailiwick of the courts of equity.").

Moreover, the nature of the relief entered by the district court "closely

resemble[d] . . . other traditional equitable remedies." *Id*. at 440. Although the

district court ordered the fiduciary to pay money owed due to a breach of its

fiduciary duties, "the fact that this relief takes the form of a money payment does

not remove it from the category of traditionally equitable relief," as "[e]quity

---

[14] *Mertens* involved "a claim seeking money damages brought by a beneficiary against a private firm that provided a trustee with actuarial services." *Amara*, 563 U.S. at 439. That claim "sought 'nothing other than compensatory damages' against a nonfiduciary," which "traditionally speaking, was legal, not equitable." *Id.*, quoting *Mertens*, 508 U.S. at 253, 255.

[15] "In *Great–West*, [the Court] considered a claim brought by a fiduciary against a tort-award-winning beneficiary seeking monetary reimbursement." *Amara*, 563 U.S. at 439, citing *Great–West*, 534 U.S. at 213. That claim – one for "a lien or a constructive trust" – "traditionally speaking . . . was legal relief, not equitable relief, unless the funds in question were 'particular funds or property in the defendant's possession.'" *Id.*, quoting *Great–West*, 534 U.S. at 213.

courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *Id*. at 441, citing Restatement (Third) of Trusts § 95. "Indeed, prior to the merger of law and equity this kind of monetary remedy against a trustee, sometimes called a 'surcharge,' was 'exclusively equitable'" and "extended to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary." *Id*. at 442. Thus, the "make-whole relief" sought by the plaintiffs was equitable, regardless of whether the relief satisfied the asset-tracing requirements discussed in *Mertens*. *Id*., citing *Mertens v. Hewitt Associates*, 508 U.S. 238, 262–63 (1993).

We see no persuasive basis to distinguish the present case from *Amara*. As in *Amara*, the Trustees seek to enforce an ERISA fiduciary's obligations to the Plan, namely White Oak's obligation to act "in accordance with the documents and instruments governing the plan," which include the IMA and its arbitration clause. 29 U.S.C. § 1104(a)(1)(D). Likewise, the monetary compensation sought by the Trustees stems from White Oak's breach of that ERISA fiduciary duty. *Amara*, 563 U.S. at 442 (equitable remedy of surcharge extends to "any violation of a duty imposed upon that fiduciary."). Accordingly, we readily conclude that the

Trustees seek equitable relief and that the limitations on monetary remedies announced by *Great-West* and *Mertens* are inapplicable to the present circumstances.[16]

We find further support for our conclusion in *Harris Trust & Savings Bank v. Salomon Smith Barney, Inc*, 530 U.S. 238, 250 (2000). In that case, the Court considered an ERISA § 502(a)(3) claim brought by a plan's trustees, seeking recovery of the plan's property from a non-fiduciary third party who took possession of that property subject to a breach of fiduciary duty by the plan's investment manager. The Court determined that the suit for "restitution of the [plan's] property . . . or disgorgement of proceeds" both sought equitable relief and was permitted by the language of ERISA § 502(a)(3), even though the statute did not specify whether non-fiduciaries who participated in a breach of duty

---

[16] The primary difference between the cases is that the petitioners in this case are the Plan's Trustees, rather than its beneficiaries as in *Amara*. However, that fact is of little import. *Amara* itself instructs that the *identity of the defendant* as "analogous to a trustee" – *i.e.*, an ERISA fiduciary – is what makes the case equitable "insofar as an award of make-whole relief is concerned." 563 U.S. at 442. Further, not only does ERISA itself contemplate that a § 503(a)(3) suit may be brought by a "participant, beneficiary, or *fiduciary*," 29 U.S.C. § 1132(a)(3) (emphasis added), but it is also an established principle of trust law that a co-trustee may bring a claim for equitable relief against another trustee for his breach of fiduciary duties. Restatement (Second) of Trusts § 200 cmt. e. When that co-trustee does so, it is not suing on its own behalf, but on behalf of the beneficiaries. *Id*.

could be held liable. *Id*. at 250, 253. The logic of *Harris Trust* applies with even greater force to the circumstances here, where the Trustees seek disgorgement of plan assets directly from White Oak, which has retained those assets in violation of its fiduciary obligation under the arbitration agreement to comply with the Award's clear order that it return the Plan's assets. A fiduciary, even more so than a third-party non-fiduciary, may not retain trust property it possesses as a result of a fiduciary breach, *see* Restatement (Second) of Trusts §§ 170, 205, 206, and therefore an action seeking return of those assets from a breaching fiduciary is equitable in nature. *Mertens*, 508 U.S. at 260 ("[T]he 'equitable relief' awardable under § 502(a)(5) includes restitution of ill-gotten plan assets or profits.").

Nor is our conclusion that the petition seeks equitable relief altered by the fact that the present dispute concerns an arbitration agreement. Again, the agreement is a "term[] of a plan" whose enforcement is sought by a party standing in the shoes of a beneficiary "against a plan fiduciary," and suits to enforce a "[t]rust[] are, and always have been, the bailiwick of the courts of equity." *Amara*, 563 U.S. at 440 (internal quotation marks omitted). Moreover, here, the Trustee's petition seeks enforcement of an arbitral award that itself grants equitable relief. Such enforcement was typically available at equity. *See* 2

56

Joseph Story, COMMENTARIES ON EQUITY JURISPRUDENCE § 1458 (4th ed. 1846)

("And Courts of Equity will, in proper cases, enforce a specific performance of an award, . . . if it is for the performance of any acts by the parties in specie, such as a conveyance of lands; and such a specific performance will be decreed, almost as if it were a matter of contract, instead of an award."); 2 John Norton Pomeroy, A TREATISE ON EQUITABLE REMEDIES § 754 (1905) ("If [an award] directs acts to be done which, if stipulated for in a contract, would render such contract capable of enforcement, then the award itself may be specifically enforced.").

In sum, we conclude that the petition to confirm the award satisfies all of the prerequisites to state a claim under ERISA § 502(a)(3). The Trustees are authorized to bring a claim under that provision; they seek to "enforce a[] provision of [subchapter I of ERISA] or the terms of the plan;" and they request relief that is equitable in nature. 29 U.S.C. § 1132(a)(3). Because ERISA provides exclusive jurisdiction to the federal courts over claims brought under § 502(a)(3), subject matter jurisdiction appears on the face of the petition.[17]

---

[17] We are unmoved by White Oak's contention that the Trustees' petition did not properly plead federal jurisdiction. Where a plaintiff seeks to invoke federal jurisdiction, the critical determination is whether "a question of federal law appears on the face of a well-pleaded complaint," not whether the complaint has invoked the correct federal statute. *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 17 (1983); 5 Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1206, at 91 (2d ed. 1990)

### 2. Any Purported State-Law Claim to Enforce This Obligation Would Be Completely Preempted by ERISA.

Indeed, even if the Trustees had styled their petition as a contract action controlled by state law, we would conclude that such a claim is completely preempted by ERISA and therefore gives rise to federal question jurisdiction.

Although a defendant may not ordinarily "remove a case to federal court unless the plaintiff's complaint establishes that the case arises under federal law," complete preemption permits removal where a federal statute "wholly displaces the state-law cause of action," such that the claim, "even if pleaded in terms of state law, is in reality based on federal law." *Davila*, 542 U.S. at 207–08 (internal quotation marks and emphasis omitted). "In concluding that a claim is completely preempted, a federal court finds that Congress desired not just to provide a federal defense to a state law claim but also to replace the state law

---

("[A] court may sustain jurisdiction when an examination of the entire complaint reveals a proper basis for assuming jurisdiction other than one that has been improperly asserted."). As noted above, *see supra* at 25, when the Trustees brought the petition, it pleaded jurisdiction according to this Circuit's law. Although that "look-through" jurisdiction is no longer proper, we need not look beyond the petition to find jurisdiction in ERISA. The facts necessary for our exercise of jurisdiction here – namely that the trustees and White Oak are fiduciaries to the Plan, executed an ERISA § 3(38) investment management agreement by which White Oak assumed fiduciary duties, and rendered an arbitral award pursuant to that agreement – all appear on the face of the petition. App'x 20–21.

claim with a federal law claim and thereby give the defendant the ability to seek adjudication of the claim in federal court." *Wurtz*, 761 F.3d at 238 (internal quotation marks omitted). Thus, unlike express preemption, "complete preemption can be the basis for federal subject-matter jurisdiction." *Id.*

As the Supreme Court has made clear, "the ERISA civil enforcement mechanism is one of those provisions with such 'extraordinary pre-emptive power' that . . . 'causes of action within the scope of the civil enforcement provisions of [ERISA] § 502(a) are removable to federal court'" under the complete preemption doctrine. *Davila*, 524 U.S. at 209 (alterations adopted), quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 65–66 (1987). *Davila* established a two-part test to determine whether a claim falls "within the scope" of § 502(a). *Id.* at 210 (citation omitted). A claim falls "within the scope of the ERISA civil enforcement mechanism" if it is brought (1) by "an individual [who], at some point in time, could have brought his claim under ERISA § 502(a)[]," and (2) "there is no other independent legal duty that is implicated by a defendant's actions." *Id.*[18]

---

[18] Although *Davila* announced a complete preemption test under ERISA § 502(a)(1)(B), the Court's reasoning makes clear that a claim that falls within *any* of the "civil enforcement provisions of § 502(a)" is completely preempted by ERISA's causes of action. *Davila*, 542 U.S. at 209.

As discussed above, the first prong of *Davila* is easily satisfied. The Trustees are a party authorized to sue under § 502(a)(3), and the petition to enforce the arbitration agreement, through confirmation of the award, is an action to enforce a plan term or document. For the same reason, "no other independent legal duty" is implicated by the petition. *Id*. White Oak's obligation to arbitrate and to comply with any resulting award was "expressly required by the terms [and documents] of the Plan itself" and therefore "[do] not create a sufficiently independent duty under *Davila*." *Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d 321, 332 (2d Cir. 2011) (emphases omitted). In other words, the petition does not seek to enforce "an agreement separate and independent from the pension plan." *Arditi v. Lighthouse Int'l*, 676 F.3d 294, 300 (2d Cir. 2012), *as amended* (Mar. 9, 2012). Instead, the agreement *is* part of the plan terms and documents.

Accordingly, we agree with the district court that it possessed jurisdiction to confirm the award. The petition is cognizable as an ERISA § 502(a)(3) action, and any action to enforce the agreement asserting a state-law breach-of-contract claim would have been completely preempted by ERISA.

**II.**  **The District Court Did Not Exceed Its Authority in Confirming the Arbitral Award as to Pre-Award Interest and the "Day One" Fees, But Erred in Confirming the Award as to "Profits."**

Satisfied of our jurisdiction, we turn to the merits. On appeal, White Oak does not challenge the Award's factual findings or legal conclusions, and concedes that the Award may not be vacated on any such basis. Instead, White Oak argues that the district court exceeded its confirmation authority by entering judgment in favor of the Trustees on (1) prejudgment interest on the disgorgement of its assets, (2) the return of the "Day One fees," and (3) "profits." According to White Oak, the PFA and FA denied the Trustees' demand for those three items of relief, and therefore the court's contrary interpretation of the Award was erroneous. Alternatively, White Oak contends that the Award is ambiguous as to whether it granted such relief and should be remanded to the arbitrator for clarification.

**A.**  **Governing Law and Standard of Review**

It is well settled that a court "should not attempt to enforce an award that is ambiguous or indefinite," and should instead remand "[a]n ambiguous award . . . to the arbitrators so that the court will know exactly what it is being asked to enforce." *Americas Ins. Co. v. Seagull Compania Naviera, S.A.*, 774 F.2d 64, 67 (2d Cir. 1985). Nonetheless, a party cannot create an ambiguity by simply pointing to

61

imprecise language or its alternative interpretation of the award – the award must actually be "susceptible to multiple meanings." *Gen. Re Life Corp. v. Lincoln Nat'l Life Ins. Co.*, 909 F.3d 544, 549 (2d Cir. 2018).[19]

In determining whether an award is ambiguous, courts are not confined to the award's text. "[A]n ambiguity in the award . . . may be shown not only from the face of the award but [also] from an extraneous but objectively ascertainable fact." *Hyle v. Doctor's Assocs., Inc.*, 198 F.3d 368, 371 (2d Cir. 1999) (internal quotation marks omitted) (finding that award, though facially clear, was ambiguous because the arbitration record created an ambiguity as to which of the respondents was liable for the award's ordered relief). Conversely, a court may enforce a seemingly ambiguous award if the award's meaning is clearly resolved by the record. *See Nano Gas Techs., Inc. v. Roe*, 31 F.4th 1028, 1031 (7th Cir. 2022) ("[W]e must enforce the award as written and if possible, resolve apparent ambiguities by examining the arbitrator's opinion and the record.")

---

[19] For example, we have found sufficient ambiguity where the award "seem[ed] contradictory on its face;" "failed to deal explicitly with the contingency which arose;" "did not clearly indicate the identity of the party against whom the arbitrator ordered relief;" "gave no indication whether plaintiff would be awarded or denied the additional compensation sought;" or used terms subject to multiple interpretations without further explanation or definition. *Gen. Re Life Corp. v. Lincoln Nat'l Life Ins. Co.*, 273 F. Supp. 3d 307, 320–21 (D. Conn. 2017) (internal quotation marks omitted) (collecting cases), *aff'd*, 909 F.3d 544 (2d Cir. 2018).

(internal quotation marks omitted); *Ganey v. Raffone*, Nos. 94-6298, 94-6300, 1996 WL 382278, at *2 (6th Cir. 1996) ("[I]t is well-settled that a district court may not interpret an ambiguous arbitration award unless the ambiguity can be resolved from the record.").

We "review the District Court's findings of fact relating to its confirmation of the arbitration award for clear error and its resolution of questions of law de novo." *Trina Solar US, Inc. v. Jasmin Solar Pty Ltd.*, 954 F.3d 567, 570 (2d Cir. 2020). Interpretation of the text of an arbitration award "is, like the interpretation of a contract, primarily a question of law." *Am. Postal Workers Union v. U.S. Postal Serv.*, 550 F.3d 27, 30 (D.C. Cir. 2008). The district court's interpretation of the arbitral record, and any findings drawn therefrom that guided the court's reading of the award, are findings of fact reviewed for clear error. *See U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 145 (2d Cir. 2001) ("[T]he 'clearly erroneous' standard of review controls our consideration of the factual findings of the district court *even though based upon a documentary record*.").

## B.    Award of Prejudgment Interest

The PFA states that White Oak must disgorge, among other items, the "NAV [net asset value] of [the Plan's] investments," S.App'x 37, and, in a

subsequent paragraph, provides that, "[a]s to the awarding of prejudgment interest, it shall be set at the New York State nine percent (9%) rate," *id*. at 39. Meanwhile, the FA expressly "incorporated" the PFA, *id*. at 50, other than in "certain areas . . . that have been modified to update the award," *id*. at 48. In its decretal language, the FA then states that "WHITE OAK shall disgorge the NAV of the Plan . . . as of [the] date of this FINAL AWARD. Disgorgement, including interest, shall take place no later than 30 calendar days after the issuance of this Award." *Id*. at 50. The FA also awarded attorneys' fees but provided that "[n]o interest shall be paid with respect to attorneys' fees and costs." *Id*. Finally, the FA decreed that "PRE-JUDGMENT INTEREST is awarded at the New York statutory rate of 9%." *Id*. at 51.

The district court concluded that the Award unambiguously granted pre-award interest on the disgorgement of the Plan's assets, beginning from the date of breach, September 18, 2018.[20] On appeal, White Oak claims that, although the

_____

[20] Although the court's original judgment provided for pre-award interest, it did not specify that pre-award interest would run from the date of breach and apply to the disgorgement of assets. The court later corrected its judgment to that effect under Fed. R. Civ. P. 60(a). White Oak claims that the district court's clarification exceeded the scope of the court's authority under Rule 60(a). That contention is meritless. We have repeatedly concluded that a district court may correct its judgment under Rule 60(a) to account for prejudgment interest and to specify a date of accrual even where the judgment originally did not provide for interest *at all*, so long as the record is clear that the court intended to award

64

Award granted prejudgment interest, the Award is nonetheless ambiguous as to the date from which that interest should run and whether it applies to the disgorgement of assets. We agree with the district court that the Award granted prejudgment interest on the Plan's assets that began to accrue on September 18, 2018, the date of the IMA's termination, and therefore AFFIRM the judgment in that respect.

### 1. The Award Granted Interest on the Disgorgement of Assets.

The text of the FA is clear. The FA ordered White Oak to "disgorge the NAV of the Plan['s assets], . . . including interest." S.App'x 50. The FA then awarded prejudgment interest and set it at a rate of 9%. **[Id.]** It is difficult to understand how this language could mean anything other than that prejudgment interest applies to the disgorgement of assets. Indeed, the FA explicitly forbade the Trustees from collecting interest on their attorneys' fees, which is clear evidence that the arbitrator both knew how to exclude portions of the award

---

interest at the time of judgment. *See Dudley ex rel. Est. of Patton v. Penn-Am. Ins. Co.*, 313 F.3d 662, 666 (2d Cir. 2002) (concluding that the district court did not err in correcting its judgment to include prejudgment interest under Rule 60(a), even though the judgment did not originally provide for interest whatsoever, where it was clear from the record that the court intended to award interest); *Robert Lewis Rosen Assocs., Ltd. v. Webb*, 473 F.3d 498, 504 (2d Cir. 2007) (similar). Here, the district court undoubtedly intended to award prejudgment interest, as such interest was embodied in the original judgment.

from prejudgment interest and carefully considered which items to exclude from the award of interest. *See Russello v. United States*, 464 U.S. 16, 23 (1983) (Where a drafter "includes particular language in one section . . . but omits it in another section . . . it is generally presumed that [the drafter] acts intentionally and purposely in the disparate inclusion or exclusion."). By contrast, the provision of the FA that requires disgorgement of assets not only lacks an express carve-out from interest, but also expressly directs White Oak to pay interest.

We further note that White Oak has adopted the position that the FA did not grant disgorgement of the "Day One" fees or White Oak's profits and that White Oak never charged any carried interest fees and so none are owed. That reading of the Award would limit the Trustees' relief solely to the disgorgement of the Plan's assets and the attorneys' fees and costs incurred during the arbitration, the latter of which are explicitly excluded from the interest award by the FA. White Oak's view that the FA also silently excluded the disgorged assets from its award of prejudgment interest would therefore result in an absurdity – under that view, the FA provided for prejudgment interest, set a rate for that interest, and yet applied that interest to nothing. White Oak cannot render the clear terms of the Award ambiguous by offering an alternative interpretation that

makes a significant item of its relief a nullity. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (Texts should be construed to prevent a "clause, sentence, or word" from being "superfluous, void, or insignificant.") (internal quotation marks omitted); *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) ("We disfavor contract interpretations that render provisions of a contract superfluous.").

Nevertheless, White Oak argues that the FA's reference to "including interest" is limited to the interest earned between the date of the award and the thirty-day deadline by which White Oak was required to disgorge the assets. We decline to inject this ambiguity into the text of the FA. White Oak's proposed interpretation is definitionally post-judgment interest, as it accrues *after* the date of the Award. However, neither the PFA or the FA contain any reference to post-judgment interest, or any kind of interest other than prejudgment interest. It is inconceivable that the phrase "including interest" silently refers to a different form of interest, without any defined rate, than the sole form of interest provided for by the Award. *See Zeiler v. Deitsch*, 500 F.3d 157, 170 (2d Cir. 2007) (In confirming an arbitration award, "the judgment to be enforced encompasses the terms of the . . . award[,] and [a court] may not enlarge upon those terms.").

Finally, White Oak argues that an award of prejudgment interest would contradict the FA's statement that "White Oak should not be penalized for the Plan's lack of action" after the termination of the IMA. S.App'x 49. However, we fail to see how that statement implies that prejudgment interest should not be assessed. Prejudgment interest is not a penalty but rather is intended "to ensure that an injured party is fully compensated for its loss." *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 54 (2d Cir. 2009) (internal quotation marks omitted). As the Supreme Court has explained, "a monetary award does not fully compensate for an injury unless it includes an interest component." *Kansas v. Colorado*, 533 U.S. 1, 10 (2001).[21] Nor did the arbitrator indicate in the Award, or anywhere else in the record, that she viewed prejudgment interest as a "penalty." In fact, the opposite

---

[21] White Oak contends that prejudgment interest would constitute a penalty in the circumstances of this case and result in a "windfall" to the Plan, because the Plan purportedly "was not deprived of its assets" and profited from White Oak's continued management of the Feeder Funds. Appellant's Br. 48. However, White Oak advanced these same arguments to the arbitrator, and the FA nonetheless awarded prejudgment interest. We decline to credit White Oak's thinly disguised challenge to the merits of the Award's grant of interest. A confirmation proceeding does not provide parties with a freewheeling opportunity to relitigate the merits of their dispute. On the contrary, the award "should be enforced . . . if there is a barely colorable justification for the outcome reached." *Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 263 (2d Cir. 2003) (internal quotation marks omitted).

is true – the arbitrator stated that prejudgment interest is a "routine[]" component of relief in ERISA cases. S.App'x 39.

Moreover, the FA's statement that White Oak should not be "penalized" was clearly directed at White Oak's collection of post-termination management fees. *Id*. at 49–50 (FA). By contrast, the FA affirmed the PFA's finding that White Oak had violated its ERISA fiduciary duties by including exit provisions in the Feeder Funds and proposing an in-kind distribution, as those actions were contrary to the terms of the IMA, and therefore reiterated that White Oak must disgorge the Plan's assets in the proper form. *Id*. at 50 ("The IMA makes clear that both sides contemplated a possible return of 'cash' within a 30-day period following a unilateral termination . . . and White Oak must find a way of meeting its contractual obligations."); *see also id*. at 24–28 (PFA, determining that the exit conditions in the Feeder Fund documents and White Oak's failure to return the Plan's money that was "no longer in White Oak's possession" violated the IMA). The Award effectuated its intent to not "penalize[]" White Oak, *id*. at 49, by permitting it to retain the post-termination management fees, and the Award contains no indication that this discussion extended to the exclusion of interest on a different item of relief for a distinct breach of fiduciary duty.

Given the unambiguous text of the Award and the clear intent of the arbitrator, we agree with the district court that prejudgment interest applies to the disgorgement of assets.

### 2. The District Court Properly Entered Judgment for Prejudgment Interest to Accrue Beginning on September 18, 2018.

Perhaps anticipating that the clear text of the Award demands prejudgment interest on the disgorgement of assets, White Oak advances the fall-back argument that the district court erred by ordering pre-award interest to accrue as of September 18, 2018, the date on which the IMA expired. In White Oak's view, the Award is ambiguous because it failed to specify an interest accrual date, and therefore the district court lacked the authority to set that date during the confirmation proceeding.

However, we see no error in the court's application of the ordinary rule that an award of interest runs "for the period between injury and judgment," *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 538 n.22 (1983). Here, White Oak breached various fiduciary duties upon the termination of the IMA, and therefore the termination date represents the date of injury.

70

White Oak responds by claiming that the arbitrator "did not find that White Oak [had] breached any duty in September 2018," Appellant's Br. at 46, and that interest running from that date would contradict the FA's statement that "White Oak should not be penalized for the Plan's lack of action in notifying [White Oak] that it had . . . some other means of handling its funds." S.App'x 49. We reject those assertions. At most, the FA determined that White Oak's continued retention of the Plan's assets and collection of management fees was excusable. Critically, the FA did not alter the PFA's conclusion that White Oak had breached its fiduciary duties and the IMA in several other respects. *Id*. at 46 (FA, stating that "[t]he reasons governing the finding that [White Oak] must disgorge all assets, and some fees, and profits, are more fully set forth in the [PFA] and will not be repeated in the [FA]."). Most notably, the Award retained the finding that White Oak had breached its duties by including exit provisions in the Feeder Funds that were inconsistent with the IMA, which injured the Trustees by preventing them from extricating the Plan's assets from White Oak's control upon the IMA's termination. Accordingly, the FA affirmed that White Oak had not returned the Plan's property held by the Feeder Funds in the proper

form required by the IMA. Thus, there is no question that the arbitrator found that the Plan was injured upon the IMA's termination.

Nonetheless, we do not mean to suggest that a district court may, in every case, determine the interest accrual date by mechanically looking to the arbitrator's determination of the date of injury or breach. White Oak's challenge fails on the record before us. During the arbitration, the Plan consistently calculated the value of the disgorged assets by applying a prejudgment interest accrual date of September 30, 2018. White Oak's briefing to the arbitrator likewise calculated interest from that same date, and while its submissions argued that interest should not be awarded because to do so would be unfair, White Oak never advanced an alternative accrual date. Indeed, White Oak's failure to identify an alternative accrual date has persisted into the confirmation proceedings, as no such date has been offered to the district court below or to this Court on appeal.

White Oak's refusal to identify an alternative date undermines its claim that the Award is ambiguous because the arbitrator did not expressly adopt the parties' joint position that interest should begin in September 2018. *See Dean v. Sullivan*, 118 F.3d 1170, 1172 (7th Cir. 1997) ("A disputant cannot stand by during

72

arbitration, withholding certain arguments, then, upon losing the arbitration, raise such arguments in federal court.") (internal quotation marks omitted). White Oak's speculation that the arbitrator adopted, *sua sponte*, a different accrual date not specified in the Award or in the parties' briefing is just that – speculation – which is insufficient to raise an ambiguity that would justify remand.

A provision plainly cannot possess "multiple meanings" when there exists only a single option from which to draw. *Cf. Gen. Re Life Corp.*, 909 F.3d at 549 (award was ambiguous where its "language [was] susceptible to multiple meanings," given that the parties and the arbitral panel each "offered a different interpretation of what the language at issue meant"). Here, the arbitrator was confronted with one accrual date – the date of the IMA's termination – as were the district court and this Court. Accordingly, the district court did not err in determining that prejudgment interest should begin to accrue on September 18, 2018.

## C. Disgorgement of Day One Fees

White Oak also contends that the district court erred in ordering the disgorgement of Day One fees, claiming that the Award permitted White Oak to

retain those fees. However, White Oak's argument primarily rests on the faulty premise that the FA wholly nullified the PFA, which it manifestly did not.

As stated in the PFA, the arbitrator found that the collection of Day One fees was a standalone ERISA violation. In doing so, the arbitrator explicitly determined that the Day One fees did not constitute management fees or carried interest fees permitted by the IMA, as White Oak "could not have provided any fiduciary services before the IMA was in effect." S.App'x 30. The FA contains no language suggesting that it modified the PFA's determination that the Day One fees were unlawful. To the contrary, the FA states that "[t]he reasons governing the finding that [White Oak] must disgorge . . . some fees . . . are more fully set forth in the [PFA] and will not be repeated in [the FA], excepting a few points," and then incorporated the PFA except where otherwise provided. *Id*. at 46, 50. Furthermore, to the extent that the FA altered the PFA's findings, its modifications addressed White Oak's conduct after the termination of the IMA, namely, its retention of the Plan's assets and continued collection of fees. *Id*. at 48. We therefore see no basis to conclude that the FA silently permitted White Oak to retain fees that, by the arbitrator's description, were for purported services rendered "before the IMA" was even created. *Id*. at 30.

White Oak advances a second argument against the return of the Day One fees; however, that argument fares no better than the first. The FA modified the PFA to permit White Oak to retain "performance fees," which the FA described as "reimbursement for managing the business and affairs of Pinnacle and Summit, rather than profits of White Oak." S.App'x 50. Although White Oak argues that the Award envisioned the Day One fees as a subset of "reimbursement[s]," the Award plainly did not do so. Rather, the cited passage intended to forbid the Trustees from recovering the management fees permitted by the IMA. *Cf. Id*. at 37 (PFA, stating that White Oak must disgorge all fees "from the time White Oak first collected any fees from the Plan until the date that assets are returned to the Plan").

Critically, the arbitrator determined that the Day One fees were of a different class than the fees "reimburs[ing]" White Oak for its services. *Id*. at 50. The PFA concluded that the Day One fees were a standalone ERISA violation, in part because those fees were *not* management fees that White Oak could collect under the IMA. *Id*. at 30. The former, unlike the latter, could not be "compensation . . . for [White Oak's] investment services" because "White Oak could not have provided any fiduciary services before the IMA was in effect." *Id*.

75

In its discussion of remedies, the PFA distinguished the disgorgement of the Day One fees from the other fees to be disgorged, further emphasizing that the Day One fees were distinct and that White Oak was not entitled to collect them. *See id*. at 37 ("The Plan must be granted . . . any fees White Oak collected, including all Day One Fees."). Finally, nothing in the arbitral record – other than White Oak's self-serving and unadopted arguments – or in our precedents interpreting ERISA suggests that the Day One fees can be retained as reimbursement for services rendered prior to the IMA. *Cf. York Research Corp. v. Landgarten*, 927 F.2d 119, 123 (2d Cir. 1991) (finding award's grant of "expenses" was ambiguous as to award of attorneys' fees and costs because of the presumption against such relief unless statutorily authorized).

In short, the PFA ordered disgorgement of the Day One fees and the FA incorporated that finding without alteration. Moreover, the Award clearly distinguishes between the management fees authorized by the IMA, which the Award permitted White Oak to retain, and the Day One fees unauthorized by the IMA, which the Award required White Oak to return. It is therefore White Oak, and not the district court, that "fails to give any effect to the [FA]" and "misunderstands the relationship between the [PFA] and [FA]." Appellant's Br.

76

at 50. Accordingly, the Award is unambiguous, and the district court did not err in entering judgment on the Day One fees.

## D. Award of Profits

Finally, White Oak argues that the district court exceeded its authority by awarding the disgorgement of its "profits" from the Plan's assets. In a similar fashion to its other challenges to the disputed aspects of the Award, White Oak claims that the FA expressly excludes an award of profits, or, alternatively, that the term "profits" is too ambiguous to enforce and must be remanded to the arbitrator for clarification.

The former contention is meritless, as the PFA and FA both clearly provided for disgorgement of White Oak's "profits." The PFA awarded "any profits . . . made through use of assets of the Plan," which it suggested could include money earned by "plac[ing] Plan assets and other compensation into companies in which [White Oak] owned equity interests." S.App'x 37–38 (internal quotation marks omitted). In turn, the FA stated that "[t]he reasons governing the finding that [White Oak] must disgorge all assets, and some fees, and profits, are fully set forth in the [PFA]." *Id*. at 46. The decretal language of the FA expressly incorporated the PFA (and therefore its award of profits), and

further provided that White Oak would retain management fees *because* they were *not* profits but instead "constitute[d] reimbursement" for White Oak's services. *Id*. at 50. We need say nothing further to reject White Oak's strained reading of the FA as excluding "profits."

Nonetheless, we conclude that the Award's failure to identify or calculate "profits" renders this item of relief sufficiently ambiguous that we cannot discern how to enforce it. Accordingly, the Award must be remanded to the arbitrator for clarification. *See Seagull Compania Naviera, S.A.*, 774 F.2d at 67 ("An ambiguous award should be remanded to the arbitrators so that the court will know exactly what it is being asked to enforce."). Although our sister circuits have recognized that an arbitral award is not required to specify a defined monetary sum and remains enforceable where the district court is left with "only the ministerial computation of the amount owed," *Flender Corp. v. Techna-Quip Co.*, 953 F.2d 273, 280 (7th Cir. 1992), determination of White Oak's profits far exceeds mere computation and raises numerous legal and factual questions that must be resolved by the arbitrator. *Compare id.* (concluding that award was final and definite where it awarded plaintiff all commissions on sales that occurred during the relevant period even where "the arbitrator did not quantify the amount

78

payable," because "this computation was easily ascertainable"), *with Loc. 36, Sheet Metal Workers Int'l Ass'n, AFL-CIO v. Pevely Sheet Metal Co.*, 951 F.2d 947, 949 (8th Cir. 1992) (finding "that the determination of damages was [not] a 'ministerial' detail" because "the determination of damages did not merely involve a simple calculation, but required the resolution of significant issues," such as the determination of the number of employees covered by the bargaining agreement at issue and the rate of pay for those employees).

We acknowledge that remand, in effect, rewards White Oak for its obstructive behavior during the damages phase of the arbitration. White Oak refused to comply with the arbitrator's initial order that the parties appoint a neutral third party to determine profits and, when the parties proceeded to hire their own experts, refused to permit the Trustees to access its records. However, we cannot enlarge upon the terms of the arbitration award by independently deciding questions that were submitted to, but unresolved by, the arbitrator, *Zeiler*, 500 F.3d at 170, and remand is therefore required.

## III. The District Court Insufficiently Explained Its Award of Attorneys' Fees for the Entirety of the Confirmation Proceeding.

Invoking its inherent authority to award fees, the district court ordered White Oak to pay $1,654,422.27, representing the entirety of the fees and costs

incurred by the Trustees during the confirmation proceedings. In doing so, the court emphasized its prior remarks "that White Oak has advanced meritless, 'entirely unpersuasive,' and even 'borderline sanctionable' positions throughout this litigation." S.App'x 104. The court had "no difficulty concluding that White Oak sought to frustrate confirmation and enforcement of the arbitral award against it with needless motions and unceasing attempts to resuscitate already-rejected arguments," and cited White Oak's opposition to the application for fees and costs as evidence of its "bad faith." *Id*. Although White Oak argued that the Trustees' requested hourly rates that were unreasonable and not in line with prevailing norms, White Oak's own counsel had recently requested fees in another case at rates "more than twenty percent higher . . . than the rates to which it now objects." *Id*.

White Oak appeals, arguing that the award of fees and costs is inconsistent with its success on certain issues or, in the alternative, that the district court's findings were insufficiently specific to support the award.

### A.    Legal Standard

We review a district court's imposition of fees and costs for abuse of discretion, "ensur[ing] that the district court's sanctions are not based on an

80

erroneous view of the law or on a clearly erroneous assessment of the evidence."

*Wolters Kluwer Financial Services., Inc. v. Scivantage*, 564 F.3d 110, 113 (2d Cir. 2009)

(internal quotation marks omitted). Because of the district court's simultaneous

role as "accuser, factfinder, and sentencing judge," our review is "more exacting

than under the ordinary abuse of discretion standard." *Id*. (internal quotation

marks omitted).

A district court may award attorneys' fees under its inherent authority

"when the losing party 'has acted in bad faith, vexatiously, wantonly, or for

oppressive reasons.'" *Eisemann v. Greene*, 204 F.3d 393, 395 (2d Cir. 2000), quoting

*F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 129 (1974). To

do so, "a court must find clear evidence that (1) the offending party's claims were

entirely without color, and (2) the claims were brought in bad faith – that is,

motivated by improper purposes such as harassment or delay." *Id.* at 396

(internal quotation marks omitted). Although both elements "must be supported

by a high degree of specificity in the factual findings," the district court may infer

bad faith "only if [the party's] actions are so completely without merit as to

require the conclusion that they must have been undertaken for some improper

purpose such as delay." *Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 143 (2d Cir.

2012) (internal quotation marks omitted). "As applied to [the] . . . enforcement of arbitration awards, the guiding principle has been [that] when a challenger refuses to abide by an arbitrator's decision without justification," a court may award attorneys' fees and costs. *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 819–20 (2d Cir. 2022) (internal quotation marks omitted); *see also B.L. Harbert Int'l, LLC v. Hercules Steel Co.*, 441 F.3d 905, 914 (11th Cir. 2006) ("When a party who loses an arbitration award . . . drags the dispute through the court system without an objectively reasonable belief it will prevail, the promise of arbitration is broken" and "that party should pay sanctions."), *abrogated on other grounds by Frazier v. CitiFinancial Corp.*, 604 F.3d 1313 (11th Cir. 2010).

The "appropriate causal test" for sanctions usually limits a fee award "to those [fees] that would not have been incurred but for the bad faith," though in exceptional cases an award may "extend[] as far as all of the wronged party's legal fees," such as where the defendant's "entire course of conduct" was a bad faith effort. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 110–11 (2017) (internal quotation marks omitted). This standard "generally demands that a district court assess and allocate specific litigation expenses." *Id*. at 109. However,

a court need only do "rough justice" and need not "achieve auditing perfection" – it may award the entire cost of litigating a motion even where the injured party "is only partially successful." *Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267, 288 (2d Cir. 2021) (internal quotation marks omitted).

**B.** **The Court's Findings Were Insufficiently Specific and Tailored.**

With these principles in mind, we easily agree with the district court that some sanctions were warranted, as the record supports its conclusion that White Oak advanced a number of arguments that were "so completely [lacking in] merit as to require the conclusion that they must have been undertaken" in bad faith. *Enmon*, 675 F.3d at 143 (internal quotation marks omitted). Most egregiously, in support of its petition to vacate the Award's grant of attorneys' fees and prejudgment interest, White Oak repeatedly misrepresented the arbitration record by insisting that it had "prevailed on all substantive issues in the arbitration" and that the Trustees "failed to have *any* success on the merits." *White Oak I*, 2022 WL 815273, at * 7, *10 (emphasis in original and internal quotation marks omitted); *see also Enmon*, 675 F.3d at 145 (affirming sanctions for a petition to confirm where the court found that counsel "made frivolous arguments that misrepresented the record") (internal quotation marks omitted).

The arbitrator repeatedly found White Oak liable for breaches of fiduciary duty and decided most of the issues in dispute in favor of the Trustees. As evidenced by her award of attorneys' fees to the Trustees, the arbitrator clearly did not regard White Oak as the prevailing party. Moreover, White Oak's persistent argument that the FA substantially overturned the PFA is completely contradicted by the plain text of the FA. White Oak also characterized certain facts as "undisputed," when plainly the Plan did dispute them. *See, e.g., White Oak I*, 2022 WL 815273, at *9 n.77 (noting that while White Oak claimed it was "undisputed" that it had not received any performance fees, the Plan had argued that White Oak received such fees and the Award made no finding on this point). As for the district court's cited example, we see no abuse of discretion in the court's determination that White Oak acted in bad faith when challenging the Trustees' hourly rates, given the markedly higher billing rates of White Oak's own counsel. S.App'x 104.

Ultimately, however, we agree with White Oak that, "the findings of the district court speak in terms too general to meet the high degree of specificity that we have required to support an award." *Oliveri v. Thompson*, 803 F.2d 1265, 1277 (2d Cir. 1986) (internal quotation marks omitted) (award of attorneys' fees

"for instituting meritless claims and for continuing the prosecution of claims after it became apparent that they were without a factual or legal basis" was insufficiently specific). Although we have ultimately rejected many of White Oak's arguments, we cannot conclude from the district court's findings that White Oak's "entire course of conduct" during the confirmation proceedings was taken in "bad faith." *Goodyear Tire*, 581 U.S. at 110 (internal quotation marks omitted). In particular, we have found merit in White Oak's contention that the award of "profits" is too ambiguous to be enforced without clarification from the arbitrator. Moreover, White Oak's jurisdictional argument presents "a question of first impression for this Court" in an area of law unsettled by the Supreme Court's intervening decision in *Badgerow*. *CVG Ferrominera Orinoco, C.A.*, 49 F.4th at 820. Although we ultimately reject that argument, we cannot conclude that it was presented "without justification." *Id*. (internal quotations marks omitted).[22]

Nonetheless, a party who frustrates an arbitration award in bad faith is not immune from sanctions merely because its arguments are not uniformly

---

[22] We note, however, that White Oak's initial opposition to confirmation was not predicated on a jurisdictional objection. Had its initial opposition on the merits been *completely* frivolous, the district court might well have been able to conclude that the entire confirmation proceeding should not have been necessary because the Trustees should never have been required to seek judicial enforcement in any court.

meritless. District courts are permitted to "assess and allocate specific litigation expenses" based on their findings, and a party's appropriate behavior in one area does not excuse its sanctionable conduct in another.[23] *Goodyear Tire*, 581 U.S. at 109. We have made clear that "even a single bad-faith filing" may demonstrate the bad faith and lack of color prerequisites to an imposition of monetary sanctions, *International Technologies Marketing, Inc. v. Verint Systems, Ltd.*, 991 F.3d 361, 369 (2d Cir. 2021), and the offending party may, where appropriate, be sanctioned even where the party advanced meritorious arguments alongside its sanctionable ones. *See Liebowitz*, 6 F.4th at 288 (A party may be held liable for the entire cost of litigating a motion that is "only partially successful."). "[S]uch judgments, made with the district court's unique understanding of the litigation, are entitled to substantial deference on appeal." *Liebowitz*, 6 F.4th at 288 (internal quotation marks omitted).

---

[23] For example, a court may "make a blanket award" against a plaintiff who "initiates a case in complete bad faith," *Goodyear Tire*, 581 U.S. at 110, and such an award, by necessity, includes the defendant's expenses incurred in opposition to otherwise permissible conduct. To illustrate, if a plaintiff knows prior to filing that she cannot possibly prevail on a necessary element of her claim, the court may award sanctions for the entire proceeding even if the plaintiff prevails on a separate element of that claim or on a subsidiary issue such as personal jurisdiction. In such a case, all fees in the litigation "would not have been incurred except for the misconduct," and thus an award of fees for the entire proceeding may be warranted. *Id.* at 111.

Nevertheless, the district court failed to make such judgments on causation that drew distinctions between arguments that were frivolous and those that were merely unavailing. "[M]indful that we are a court of review, not of first view," we cannot make specific findings on the district court's behalf. *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005). Although the district court referred to instances where it had warned White Oak that its arguments were meritless or "borderline sanctionable," it failed to provide sufficient examples, or to attribute particular fees charged by counsel for the Trustees to such frivolous arguments. S.App'x 104 (internal quotation marks omitted). The example it did provide perhaps demonstrates White Oak's bad faith in opposing the application for attorneys' fees itself, but an award covering that application would be justified only if White Oak was otherwise sanctionable in the first instance. In any event, the court did not attempt to "calibrate the sanction to fees and costs incurred by [the Trustees] by virtue of [White Oak's] bad faith conduct." *Liebowitz*, 6 F.4th at 290.

"Absent more explanation from the district court," we cannot conclude that its sanction was a permissible exercise of its authority. *Id*. Accordingly, we remand the order granting the Trustees their attorneys' fees and costs, so that the

district court may make more specific findings as to which of White Oak's positions were taken in bad faith and to determine the categories of expenses, and the amounts of those expenses, for which White Oak should be held responsible.[24]

## CONCLUSION

By enacting ERISA, Congress intended to create a "uniform regulatory regime over employee benefit plans" and ensure that regulation of such plans "would be exclusively a federal concern." *Davila*, 542 U.S. at 208. The duties owed by fiduciaries, as well as the resolution of disputes about those duties, are central concerns of that comprehensive regulatory scheme. Congress further intended that plan participants, beneficiaries, and fiduciaries have "ready access to the Federal courts" when seeking to enforce plan documents and terms. 29 U.S.C. § 1001(b). Our holding today effectuates that intent and fits comfortably within the statutory language of ERISA.

We conclude that the Trustees' petition to enforce the arbitral award is cognizable under ERISA § 502(a)(3), as the Trustees are a party authorized to sue by that provision, seek to enforce a right – the arbitration agreement and judicial review of the resulting award – created by a Plan document or term, and request

---

[24] We express no opinion as to the proper resolution of those questions.

equitable relief against a co-fiduciary to the Plan. Such suits, brought by a fiduciary on behalf of the beneficiaries to enforce a plan document or term against a co-fiduciary, seek relief traditionally available in equity. In the specific circumstances before us here, we find that the Trustees' petition to confirm the award is itself cognizable under ERISA and therefore agree with the district court that it had jurisdiction over the action.

We further conclude that the district court properly entered judgment on the confirmation petition as to the disgorgement of pre-award interest on the Plan's assets and the return of the "Day One" fees collected by White Oak, as the Award plainly provided for such relief. However, the district court erred in entering judgment on "profits," as the Award's grant of profits is too ambiguous to enforce and must be remanded to the arbitrator for clarification of the nature and amount of income accruing to White Oak that should be categorized as "profits." Finally, we conclude that the district court exceeded its discretion in awarding the Trustees the entirety of their attorneys' fees and costs incurred during the confirmation proceeding, as it made insufficiently specific findings of bad faith and did not limit the award to the fees expended in opposing White Oak's frivolous arguments.

Accordingly, we AFFIRM the judgment as to the disgorgement of prejudgment interest on assets and the "Day One" fees, VACATE the judgment as to the disgorgement of White Oak's profits and payment of the Trustees' attorneys' fees and costs during the court's proceedings, and REMAND for further proceedings consistent with this opinion. The parties are to bear their own costs for this appeal.